1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NICHOLAS HARRIS,

               Petitioner,

    v.

SYLVIA GARCIA,

               Respondent.

_____/

No. C 01-21193 RMW (PR)

ORDER GRANTING IN PART AND
DENYING IN PART PETITIONER'S
WRIT FOR HABEAS CORPUS

     On April 9, 1997, petitioner was convicted of two counts of grand theft, one count of attempting to dissuade a witness in furtherance of a conspiracy, one count of access card forgery, and one count of escape from a county jail. After unsuccessfully seeking relief in the California courts, he filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging all five convictions. This court found that the petition stated eleven cognizable claims under § 2254 and issued an order to show cause why this court should not grant the writ. Respondent filed an answer addressing the merits of the petition, and petitioner filed a traverse. Thereafter, on September 18, 2007, the court ordered respondent to file a supplemental answer showing cause why the petition should not be granted based upon an additional claim raised in petitioner's amended petition, which claim challenges petitioner's sentence. Respondent filed a supplemental answer, and petitioner filed a supplemental traverse.

After reviewing the papers and the record, the court finds that petitioner is entitled to habeas corpus relief as to his conviction of one of the two counts of grand theft. Accordingly, the court grants the petition to the extent it seeks relief from the state court judgment on that count. The court finds, however, that petitioner is not entitled to habeas corpus relief with respect to his conviction on the four remaining counts, and denies his petition with respect to his conviction on such counts. Based upon the sentences he received on the four remaining counts, upon which habeas relief is not granted, petitioner's continued custody in is lawful.

**BACKGROUND**

On March 18, 1997, petitioner was brought to trial on five separate felony charges, and allegations of four prior "strike" convictions. Four of the five charges against petitioner stemmed from his and his girlfriend's (Gina Miller) relationships with a series of elderly gentlemen, whom the couple was accused of defrauding. The prosecution formally charged petitioner and Miller with grand theft by false pretenses from two such gentlemen, Nicholas Brayevich and Wilbur Johnson, and additionally introduced evidence of three uncharged similar incidents involving Ned Wyss, Robert Dodd, and Jack McCallister. In addition to the theft charges, petitioner was charged with access card forgery with respect to Wilbur Johnson, and both petitioner and Miller were charged with attempting to dissuade Nicholas Brayevich from testifying. Petitioner was also charged with escaping from the Santa Clara County jail while awaiting trial on the above charges.

Petitioner and Miller were tried together, and the evidence admitted against them was voluminous. The California Court of Appeal summarized the evidence presented to the jury in a "much abridged" format as follows:

Nicholas Brayevich, Counts 1-4

In September 1994, 84-year-old bachelor Nicholas Brayevich shared a house with his sister Stella in the Willow Glen area of San Jose. The day after Stella was moved into a convalescent hospital and Brayevich was left alone in their house, defendant Miller, a total stranger, approached him as he was gardening, identified herself as Selena Bay, and asked to use his bathroom. Brayevich allowed her to do so, and after she came out the two stood in the kitchen and talked.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Miller repeated the visit a few days later, and continued to visit Brayevich, uninvited, on a regular basis.  She arrived and left by taxi and did not explain the reason for her visits.  From questioning Brayevich, she found out that one of his sisters was dead and the other was in a convalescent hospital.  She asked whether he was lonely.  She told him that she was from Greece and was alone in this country. She said she had no family and she was single, a virgin, and that she also lived alone.

The second time Miller came to Brayevich's house, he saw her "opening drawers and shuffling through clothing and this and that, looking in the closets."  Brayevich "should have objected", but he thought she was "young" and "innocently curious".  Nevertheless, he also thought she was "quite audacious," rummaging through drawers where he kept his business records.

Once, he was surprised to see Miller at the convalescent hospital standing at the door of Stella's room looking in at her.  Miller had not accompanied Brayevich to the hospital nor had she told him she was planning to go there.

About the sixth or seventh time Miller visited Brayevich, she brought along [petitioner] Harris, whom she introduced as "Sam," an "old" and she implied, undesirable friend from Los Angeles.  She never admitted Harris was her boyfriend and "scoffed at the idea" when Brayevich asked if she were married to him.

In reality, she was living with defendant Harris "as husband and wife" along with her two children, three-year-old Moses and four- or five-year-old Eric.  Harris had been her boyfriend for four or five years and they had lived together in Los Angeles, San Carlos, and several addresses each in Sunnyvale, San Jose, and Campbell.

Brayevich regularly received money from his investments and had accounts at Bank of the West, American Savings, and Smith Barney, among other financial institutions.  He lived frugally, paying cash or "do[ing] without."  He did not shop at expensive stores like Nordstrom's, Macy's, or the Emporium.  Miller convinced him to apply for credit cards, and to take her shopping at various department stores.  She "knew the best places" to shop. "Generally I followed her like a faithful puppy and she would go ahead of me and do the shopping."

Miller asked for and received cash (she had a "liking for hundred dollar bills"), which Brayevich took from bank accounts, his Smith Barney account, and as cash advances on his recently-acquired American Express and Union 76 credit cards.  The cash amounts ranged from $500 to $25,000.

Miller also asked for and received a cashier's check for $51,815 for a down payment on a house, a $45,000 Chevy Suburban (to which Brayevich retained title in his name), almost $8,000 for a 1977 Mercedes convertible and a new top, a television set and stereo equipment costing $5,651.95, and a $21,249.90 diamond "engagement" ring.  Miller told Brayevich the ring would make their relationship more "bonding" or "binding".

Brayevich never intended to marry Miller even though she talked about doing so.  Brayevich admitted to a "sexual" relationship with Miller, but it consisted of hugging, kissing, and back rubbing.  Miller always wore underwear, at least, and there was no sexual intercourse.  Brayevich spent money on Miller because he wanted to "put a hold on her" and keep her affection.

In addition, Brayevich gave Harris cash because he thought Miller wanted him to and paid credit card bills for vehicle rentals, airplane tickets, jewelry, clothing, and other articles run up by Miller and Harris without permission.

Brayevich eventually realized defendants were engaged in a "skin game" and they "were out to get as much money" as possible from him. He would never have maintained the relationship and he would not have given Miller and Harris money if he had known that Miller used different names, had two children, and was living with Harris.

The "gig [was] up" as Brayevich put it when Brayevich's nephew and next door neighbor, Ilko Vucia, called the San Jose police. On April 5, 1995, Officer Gordon Bowen contacted Brayevich who introduced Miller, who was visiting him, as Selena Bay. Bowen set up surveillance around Brayevich's house and observed Miller leave the residence, walk around the corner and get into a car which drove off. It appeared that she had prearranged for someone to pick her up.

On August 16, 1995, Bowen and his partner contacted Brayevich and Miller as she drove Brayevich's car into his driveway. Brayevich was upset and walked to the side of the house. Miller identified herself to Bowen as "Selena Brayevich" and said she had no driver's license. She became angry and aggressive when Bowen said he knew her name was not Brayevich. She eventually identified herself to officers as Gina Miller and was fingerprinted and photographed.

On August 24, 1995, Bowen and Officer Peter Scanlan contacted Brayevich and informed him of Miller's identity and the existence of her two small children. Brayevich told Scanlan that Miller said she was a virgin. He did not understand "how could a young lady be so deceitful." Scanlan said Brayevich seemed both "sad" and "somewhat relieved" that he knew the truth about Miller and Harris. Brayevich immediately stopped spending money on them.

In September 1995, Brayevich received several telephone calls from [petitioner and Miller]. Scanlan provided him with a tape recorder and he taped a number of the calls. Harris wanted to know if Brayevich was going to "press charges" and asked him to lie to the police because he had enough problems. Miller called Brayevich and asked him "to forget the whole thing." She told him she loved him and cared for him, and that he "gotta stop those cops honey." Eventually, she wound up saying "if I go to jail, I'm gonna kill you! I swear! I don't want to go to jail honey. I don't want to."

Wilbur Johnson, Counts 5 and 6

Eighty-two-year old Wilbur Johnson was a retired accountant who lived on a fixed income and who was very careful with his money. Two months before Wilbur died in November 1995, his son, Dave, who was accustomed to spending a lot of time with his father, moved in and lived with him until his death.

Afterward, Dave found various charge receipts among Wilbur's papers for the purchase of items which Wilbur would not have used himself. These included the purchase of a cellular telephone, accessories, and service even though Dave had never seen Wilbur with a cellular telephone. There were charges from Bare Essentials amounting to $271.73, and charges of women's and children's clothing from Mervyn's ($483.77) and the Emporium.

On July 15, 1995, a few months before his death, Wilbur used his Visa account to charge furniture costing $886.99 at the Bedroom Store. The sales receipt showed it was delivered to [petitioner and Millers'] Sunnyvale Avenue address and it was found in [petitioner's] house by the police when it was searched the following August. Receipts for items purchased on Wilbur's charge accounts were also found in defendants' residence. Cellular telephone charges on Wilbur's credit card accounts corresponded to numbers used by

[petitioner and Miller] and not Wilbur.  Wilbur never mentioned [petitioner and Miller] to Dave.

On an earlier occasion, on June 12, 1995, Wilbur, accompanied by [petitioner] who was using the name, "Michael Marcos," came into the Circuit City store on Stevens Creek and bought the cellular telephone.  Wilbur signed the credit card charge slip for the $221.53 initial purchase and identified himself with a social security card and a driver's license.  On June 28, 1995, Michael Marcos traded in the analog telephone for a store credit and bought a digital telephone which cost an additional $113.  A second trade-in for a more expensive model costing an additional $89 took place on August 16, 1995.  Michael Marcos also added a performance guarantee and a cigarette lighter adapter.  The clerk allowed Michael Marcos to obtain a store credit for the initial purchase because Marcos was with Wilbur Johnson when the initial transaction occurred.  The subsequent purchase was made partially with funds charged to Wilbur's account.

Evidence of Common Scheme or Plan

    1.   Jack McCallister

Around October 1995, 78-year old Jack McCallister was walking in a Safeway store parking lot in Campbell when two young women came up behind him and started a conversation.  One called him "Fred" and told him she thought he was someone she knew.  She introduced the other woman and then asked McCallister for his telephone number or address so she could take him out to dinner.  He made an appointment with her.

However, he told his daughter, Jill Genestra, about the incident.  She was out of sight in the kitchen when the two women showed up at McCallister's home.  After asking if he was alone, both women appeared surprised and tense when he said his daughter was there and she walked into the room.  The women refused to give their names and show identification.  After more questioning by Genestra, McCallister's two sons-in-law arrived and Genestra asked the women to leave.  They drove away in an older model white Cadillac.  Several months later, Genestra saw a newspaper article with a photograph of a woman resembling one of the two persons who invited her father to dinner.  McCallister recognized the photograph in the newspaper as resembling the woman who approached him in the parking lot but neither he nor Genestra could identify Miller in court.

    2.   Robert Dodd

In the summer of 1995, 79-year-old Robert Dodd met a woman who identified herself as "Savanna" as he was dining alone in a Lyon's restaurant in Sunnyvale.  She convinced him she was alone and without money or any place to stay with her two children, Eric and Moses.

Dodd allowed her to spend a night or two at his house (they slept in the same bed but there was no sex) and then booked them into a motel.  Dodd paid for Eric and Moses to visit the dentist and took Savanna shopping to purchase clothing for them.  He paid for the motel bills, telephone calls, nanny services, and some jewelry, but only "nickel or dime stuff."  In the four to six months he knew Savanna he spent about $5,000 on her.  He had to mortgage one of his homes to pay the expenses he incurred on her behalf.  He had intended to sell that house in any event.  He last saw her in the beginning of October 1995, two weeks before he was interviewed by Officer Scanlan.  He never saw her again.  He could not identify Miller in court.

3.   <u>Ned Wyss</u>

In January 1994, Miller approached 89-year-old retired widower Ned Wyss in a Lucky grocery store in Cathedral City near Palm Springs. She identified herself as "Selena" and said she wanted to get to know him. She had a young child named "Moses" with her. Wyss ignored her. As he walked away, she said, "come on, be nice. Can you give me your name and phone number . . ."

Wyss obliged. He talked to her for about 15 minutes and gave her his phone number. She called him the next day and asked him to buy food for her children. She met him at the Lucky store where he purchased groceries for her. She then told him she lived with an uncle who wanted her to move out. Wyss verified this by telephoning the uncle at a number Miller gave him, then they drove to an apartment complex where they met [petitioner] whom Miller introduced as the apartment manager and her friend.

Harris told Wyss it would cost $900 for Miller to rent an apartment. Wyss produced the money the next day.

Miller invited Wyss to dinner at [petitioner's] apartment in the same complex as the apartment she leased and introduced him to a woman who was supposed to be [petitioner's] wife. [Petitioner] and Miller "had the run of [Wyss's] house," and they became "pretty good friends" with him. Miller and [petitioner] often spoke to each other in a foreign language and Miller told Wyss she spoke Russian. Miller eventually identified herself as "Selena McGill." "McGill" was the surname of [petitioner's] father which [petitioner] occasionally used.

Miller "was always trying to be amorous" with Wyss, including trying to kiss him. However, he rebuffed her. On one occasion after taking a shower, she emerged from his bathroom wrapped in a towel. She stood in front of him and dropped it. He told her to "get going." Miller said she wanted to marry him and asked him to buy her an engagement ring. Wyss laughed and absolutely refused, but, nevertheless, Miller introduced him as her fiancé.

[Petitioner] asked to borrow a credit card for gasoline and then "disappears" for two or three weeks while he ran up a "tremendous" amount of charges. [Petitioner] asked Wyss to cosign a credit card application so [petitioner] could establish his own credit history. Wyss did so and Harris charged between $20,000 and $30,000 on the account. [Petitioner] also charged a $14,000 Rolex watch to Wyss's account without authorization.

Before Wyss met [petitioner and Miller] he never kept a credit card balance and he had no outstanding debts. He owned a trailer home in Cathedral City and a condominium in Los Angeles which he purchased with cash. When Wyss received the bills for purchases signed by [petitioner] and confronted him about the charges, [petitioner] suggested Wyss get a loan on his condominium to pay the charges. [Petitioner and Miller] also promised to pay the charges but never did so. When Wyss said he was going to call the police, Miller told him he should not do so. After that, they disappeared. Wyss eventually mortgaged his condominium to pay the bills. However, as the charges mounted, he was forced to file for bankruptcy and lost his condominium.

<u>Harris's Escape</u>

On February 16, 1996, [petitioner] was an inmate in a Santa Clara County jail dormitory with Jamie Owen, who was due to be released that evening, and Dana Mulvani. Mulvani pointed out that Owen and [petitioner] bore a strong resemblance to each other.

> [Petitioner] offered Owen $5,000 to switch identities with him so that [petitioner] would be released instead of Owen.  Owen expressed reservations about the idea, but [petitioner] both cajoled and threatened him, saying that he knew where Owen's family lived.
>
> The two men exchanged wrist bands, and Owen provided [petitioner] with the personal information he would need to pass through the jail release procedure.  [Petitioner] was fingerprinted and then released around 12:40 a.m.  Three or four hours later, Owen contacted jail guards saying he had slept through his release call.  [Petitioner] was rearrested around June 6, 1996, in the Beverly Hills area.

People v. Miller, No. H017020, Slip Op. at 2-9 (Cal.Ct.App. June 7, 2000) (hereinafter "Slip Op.")..[1]

On April 9, 1997, the jury found petitioner guilty of grand theft as to Brayevich (Cal. Pen. Code § 487) with an enhancement for taking property valued at more than $150,000 (Cal. Pen. Code § 12022.6(b)), attempting to dissuade a witness (Brayevich) in furtherance of a conspiracy, (Cal. Pen. Code § 136.1(c)(2)), access card forgery relating to Wilbur Johnson (Cal. Pen. Code § 484f(b)), grand theft from Johnson (Cal. Pen. Code § 487), and escape from a county jail (Cal. Pen. Code § 4532(b)(1)).  A bench trial then commenced on petitioner's four prior "strike convictions (Cal. Pen. Code §§ 667(a), 1170.12(b)(c)).  On April 10, 1997, the trial court found these allegations true.

The trial judge sentenced petitioner to three consecutive prison terms of 25 years to life Count One (grand theft from Brayevich), Count Five (grand theft from Johnson), and Count Seven (escape from county jail).  The judge also sentenced petitioner to a sentence of 25 years to life on Count 2 (attempting to dissuade a witness), to run concurrently with the sentence on Count One, and to a sentence of 25 years to life on Count Six (access card forgery), stayed pursuant to Penal Code section 654 (which prohibits multiple punishment for the same conduct).  Additionally, the trial court sentenced petitioner to a consecutive two-year term for the excessive taking enhancement

---

[1]The state appellate court opinion was certified for partial publication pursuant to California Rule of Court 976(b).  See People v. Miller, 81 Cal.App.4th 1427 (2000).  The opinion is certified for publication "with the exception of 5 and 6 of the part entitled Sufficiency of the Evidence of False Pretense; and the following parts entitled Access Card Forgery, Dissuading of a Witness or Victim, Escape, Owen's Statements, Accomplice Testimony Instructions, and Motion Claiming Individous Prosecution." Id.

1     Petitioner appealed to the California Court of Appeal, Sixth Appellate District.  The

2 appellate court affirmed his conviction and sentence in a partially published opinion on June

3 7, 2000.[2]  Petitioner sought review from the Supreme Court of California.  The Court denied

4 review on September 20, 2000.  Petitioner filed this writ seeking habeas relief on December

5 18, 2001. On July 28, 2003, respondent filed an answer addressing the merits of the petition,

6 and on August 27, 2003, petitioner filed a traverse.[3]  Thereafter, petitioner exhausted an

7 additional claim challenging the use of his prior convictions as "strikes" by raising such

8 claim in an unsuccessful a habeas petition filed in the California Supreme Court.  Petitioner

9 then raised this in an amended petition filed in this court on June 12, 2007.  Respondent filed

10 a supplemental answer on October 23, 2007 addressing the additional claim , and petitioner

11 filed a supplemental traverse January 10, 2008.

12                                  **DISCUSSION**

13 A.     Standard of Review

14     This court will entertain a petition for writ of habeas corpus, "in behalf of a person in

15 custody pursuant to the judgment of a State court only on the ground that he is in custody in

16 violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

17 The court may not grant a petition with respect to any claim that was adjudicated on the

18 merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a

19 decision that was contrary to, or involved an unreasonable application of, clearly established

20 Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

21 decision that was based on an unreasonable determination of the facts in light of the evidence

22 presented in the State court proceeding."  28 U.S.C. § 2254(d).

23

24 _____

25     [2]On July 6, 2000, the court of appeal issued an order modifying its June 7, 2000 opinion.  The July 6, 2000, order did not alter the judgment.

26     [3]On March 15, 2004, April 14, 2004, and May 10, 2004, this court issued orders
27 requiring respondent to lodge additional state court trial exhibits and pages that appeared to be missing from the Clerk's Transcript lodged with this court.  Respondent lodged copies of
28 all of the requested documents.

1   "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

2   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

3   law or if the state court decides a case differently than [the] Court has on a set of materially

4   indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000). "Under

5   the 'unreasonable application clause,' a federal habeas court may grant the writ if the state

6   court identifies the correct governing legal principle from [the] Court's decisions but

7   unreasonably applies that principle to the facts of the prisoner's case." Id. "[A] federal

8   habeas court may not issue the writ simply because the court concludes in its independent

9   judgment that the relevant state-court decision applied clearly established federal law

10   erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

11   A federal habeas court making the "unreasonable application" inquiry should ask

12   whether the state court's application of clearly established federal law was "objectively

13   unreasonable." Id. at 409.  The "objectively unreasonable" standard does not equate to

14   "clear error" because "[t]hese two standards . . . are not the same.  The gloss of clear error

15   fails to give proper deference to state courts by conflating error (even clear error) with

16   unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

17   While a state court decision may no longer be overturned on habeas review simply

18   because of a conflict with circuit-based law, circuit decisions may still be relevant as

19   persuasive authority to determine whether a particular state court holding is an "unreasonable

20   application" of Supreme Court precedent or to assess what law is "clearly established." Clark

21   v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir. 2003).

22   B.   Analysis of Legal Claims

23   As grounds for federal habeas relief petitioner asserts that: (1) there was insufficient

24   evidence to convict him of theft by false pretenses as to Nicholas Brayevich; (2) the trial

25   court failed to instruct the jury of the need for corroborating evidence as to the grand theft

26   count; (3) there was insufficient evidence to convict him of access card forgery; (4) there was

27   insufficient evidence to convict him of theft as to Wilbur Johnson; (5) the trial court

28   erroneously admitted evidence of uncharged acts of misconduct; (6) there was insufficient

1   evidence to convict him of attempting to dissuade a witness or victim; (7) the trial court

2   failed to instruct the jury on the lesser included offense of misdemeanor attempting to

3   dissuade a witness or victim; (8) the trial court gave confusing and conflicting instructions on

4   the offense of attempting to dissuade a witness or victim; (9) the trial court failed to instruct

5   on the necessary element of attempt on the attempting to dissuade a witness charge; (10)

6   there was insufficient evidence to convict him of escape; (11) the admission of hearsay

7   testimony regarding his escape offense violated his right to confront and cross-examine his

8   accusers and his right to due process; and (12) his sentence violates his right to due process

9   because the trial court did not prove beyond a reasonable doubt that his prior convictions

10  qualified as "strikes" under California's "three strikes" law.

11          1.      Sufficiency of Evidence Supporting Theft By False Pretenses Conviction
                    (Nicholas Brayevich)

12      Petitioner asserts that the evidence adduced at trial was insufficient to support any of

13  his five convictions.  He first claims that the evidence introduced at trial was insufficient to

14  support his conviction of theft by false pretenses as to Nicholas Brayevich.  In particular, he

15  contends that there was insufficient evidence to support this conviction because there was no

16  competent evidence corroborating Brayevich's testimony regarding co-defendant Miller's oral

17  false pretenses.

18      The Due Process Clause "protects the accused against conviction except upon proof

19  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

20  charged."  In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

21  evidence in support of his state conviction cannot be fairly characterized as sufficient to have

22  led a rational trier of fact to find guilt beyond a reasonable doubt e states a constitutional

23  claim,  which, if proven, entitles him to federal habeas relief.  see Jackson v. Virginia, 443

24  U.S. 307, 321, 324 (1979). A federal court reviewing collaterally a state court conviction

25  does not determine whether it is satisfied that the evidence established guilt beyond a

26  reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court

27  "determines only whether, 'after viewing the evidence in the light most favorable to the

28

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"   See id. (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  See Jackson, 443 U.S. at 324.

Sufficiency claims are judged by looking at the elements of the crime under state law. Jackson, 443 U.S. at 324, n.16.  Under California law, a theft conviction on the theory of false pretenses requires proof that:

> (1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.  In this context, reliance means that the false representation 'materially influenced' the owner's decision to part with his property; it need not be the sole factor motivating the transfer.  A victim does not rely on a false representation if 'there is no causal connection shown between the [representations] alleged to be false' and the transfer of property.  Thus, if the defendant makes both true and false statements to the owner, but the false statements are irrelevant to the owner's decision to transfer the property, theft on the theory of false pretense has not been committed.  Reliance may be inferred from all the circumstances.

People v. Wooten, 44 Cal. App. 4th 1834, 1842-43 (1996) (citations omitted).

Moreover, if the conviction rests primarily on the testimony of a single witness that the false pretense was made, the making of the pretense must be corroborated.  Cal. Penal Code § 1110.  The corroboration required by Penal Code section 1110 is of the making of the pretense.  Id.  The circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons may be looked to for the corroborative evidence contemplated by the law.  People v. Randono, 32 Cal. App. 3d 164, 173 (1973). The defendant cannot be convicted "unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances."  Cal. Penal Code § 532(b).  Corroborating evidence is sufficient if it tends to connect the defendant with the commission of a crime in such a way so as to reasonably satisfy the jury that the complaining witness is telling the truth; the corroboration is inadequate if it requires aid from the testimony of the witnesses to be corroborated to connect the defendant with the alleged offense.  People v. Fujita, 43 Cal. App. 3d 454, 470 (1974); People v. MacEwing, 45 Cal. 2d

1    218, 225 (1955).  Corroborative evidence may be found in the circumstances connected with

2    the transaction, the conduct of the defendant, and his declarations to other persons.  <u>Fujita</u>, 43

3    Cal. App. 3d at 470; <u>Randono</u>, 32 Cal. App. 3d at 173.  Because the corroborative evidence

4    need only tend to implicate the defendant in the alleged illegal activity, it may be slight and

5    entitled to little weight standing alone.  <u>Fujita</u>, 43 Cal. App. 3d at 470.

6          At trial, Nicholas Brayevich testified at length regarding his relationships with co-

7    defendant Gina Miller and with petitioner.  Brayevich stated that his decision to part with

8    over $150,000 was based largely on Miller's representations that she was single, living alone,

9    had no children, and did not have a romantic relationship with petitioner.  Nevertheless,

10   petitioner argues, there was no competent evidence admissible against him corroborating

11   Brayevich's testimony regarding Miller's oral misrepresentations.[4]  The California appellate

12   court rejected this contention, finding that evidence regarding the Wyss, Dodd, and

13   McAllister incidents was sufficient to provide the corroboration required by Penal Code

14   section 532(b).

15         As summarized above, eighty-two-year old Ned Wyss testified that Miller approached

16   him while shopping alone at a Lucky grocery store near Palm Springs, and the two thereafter

_____

[4]In his traverse, petitioner contends for the first time that he did not direct, and therefore was not responsible for, co-defendant Miller's false representations about herself to Nicholas Brayevich. The jury, however, did not need to reach the conclusion that petitioner directed Miller to make the false representations.  This is because the prosecution of <u>petitioner</u> as to Nicholas Brayevich proceeded under California's "uncharged conspiracy" doctrine.  This doctrine allows evidence of a conspiracy to establish criminal liability for acts of a co-conspirator -- in this case, permitting the jury to find that petitioner was criminally responsible for co-defendant Miller's false representations to Brayevich if it found that a conspiracy existed between petitioner and Miller to commit theft by false pretenses.

An extremely liberal construction of the traverse might lead one to conclude that petitioner also contends that the trial court's instruction on, and the jury's probable application of, California's uncharged conspiracy doctrine violated his right to be proven guilty beyond a reasonable doubt of the false representation element of Penal Code section 484.  An issue, however, cannot be raised for the first time in a traverse.  <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994); <u>Sims v. Larson</u>, 2002 WL 1497922,*2, n.4 (N.D. Cal. 2002).  We also note that, given the complete absence of this issue from the state appellate court opinion, Harris' petition for habeas corpus, and respondent's answer, the issue is almost certainly unexhausted.

developed a relationship. During the course of this relationship, Miller misrepresented both her name (she identified herself as 'Selena McGill'), and her connection with petitioner (whom she introduced as her apartment manager and friend). After borrowing Wyss's credit card, petitioner disappeared for two to three weeks and ran up a "tremendous" amount of charges. Wyss also testified that petitioner asked him to co-sign a credit card application, then charged $20,000 to $30,000 on the account. Petitioner also charged a $14,000 Rolex watch to Wyss's account without authorization.

Seventy-nine-year old Robert Dodd testified that he was approached by a woman who identified herself as 'Savanna' when dining alone at a Lyon's restaurant in Sunnyvale. 'Savanna' represented that she was alone and without any money or place to stay with her two children, Eric and Moses. During a relationship that lasted approximately four to six months, Dodd spent about $5,000 on 'Savanna.'

Seventy-eight-year old Jack McAllister testified that two women approached him in a Safeway parking lot in Campbell and engaged him in conversation. One of the two women asked to take him out to dinner. The dinner engagement was later broken by McAllister's daughter, Jill Genestra, when the women arrived at McAllister's home and refused to give their names. Genestra later saw Miller's photograph in the newspaper and thought the woman in the photograph resembled one of the women who had approached her father.

The testimony of Messrs. Wyss, Dodd and McAllister tends to show that Miller had a practice of approaching elderly men who appeared to be living on their own, giving them a false name, and attempting to develop a relationship with them based on their sympathy, and, in some cases, their sexual desires. Miller heightened these feelings by misrepresenting that she was without both resources and romantic entanglements, including such an entanglement with petitioner, whom she introduced to Brayevich as a friend and to Wyss as a friend and apartment manager. The court finds this testimony sufficient to corroborate Brayevich's allegations that Miller and petitioner misrepresented Miller's identity and personal circumstances, including the nature of Miller's relationship with petitioner.

Apparently anticipating an argument by respondent to the contrary, Harris's petition argues at length that Brayevich's testimony concerning co-defendant Miller's false representations was not corroborated by a taped conversation that occurred between Miller and Brayevich on September 22, 1995. The emphasis petitioner places on the admissibility of this taped conversation appears misplaced for several reasons.

First, the appellate court did not rely on this conversation to reach its conclusion that section 532(b)'s corroboration requirement had been met. Second, although the record is somewhat ambiguous on this point, it appears that the jury could have interpreted certain of the trial judge's admonishments and instructions as precluding its consideration of statements made by co-defendant Miller subsequent to petitioner's arrest (including the September 22, 1995, conversation between Miller and Brayevich) against petitioner. If the jury thus interpreted the admonishments and instructions, it, like the appellate court, did not rely on the conversation to reach its conclusion that section 532(b)'s corroboration requirement was satisfied. Finally, for the reasons discussed below, the taped conversation did corroborate Miller's earlier alleged false representations, and it was admissible evidence that could be used against petitioner.

The conversation contained the following exchanges between Brayevich and Miller:

Miller: I don't know what you want from me? I don't understand. Look, the only thing I gave you was sex.
Brayevich: Sex? What kind of sex? What was all this bull about you being a virgin and everything . . . and then . . . the truth comes out that you had two kids.
Miller: Wait a second sweetheart, I didn't have no sex; I'm not even married. I live on my own. Okay?
Brayevich: Then what's all this about you having two kids?
Miller: I don't have two kids. They're lying to you
. . .
Miller: Listen Nicky, wait a second, I don't want you to be thinking that I was married, because I'm not. And I don't have children.
Brayevich: Oh? You don't have children?
Miller: No .
. . .
Miller: The reason I didn't tell you my real name is because I figured you wouldn't go out with me . . .

1    (Answer to Petition for Writ of Habeas Corpus ("Answer"), Exhibit E, lodged April 22,

2    2004.)

3           Petitioner's arguments to the contrary notwithstanding, a logical inference can be

4    made from Miller's statements during this recorded conversation that she had, in the past,

5    represented to Brayevich that she had no children, was a virgin, and lived alone.  As such,

6    this conversation does corroborate Brayevich's testimony regarding Miller's false

7    representations.

8           Petitioner asserts that, even if co-defendant's statements during the September 22,

9    1995, conversation implicitly corroborate her alleged prior false representations, the taped

10   conversation was inadmissible for two reasons.  First, petitioner argues that Miller's tape

11   recorded statements were out-of-court statements of an accomplice, which themselves must

12   be corroborated under the accomplice rule contained in California Penal Code § 1111

13   ("section 1111") before they can be used against him.  He cites the case of <u>People v. Belton</u>,

14   23 Cal. 3d 516, 519-27 (1979), in which the California Supreme Court held that section

15   1111, which provides that a conviction cannot be based solely on uncorroborated accomplice

16   testimony, applies to uncorroborated <u>out-of-court</u> accomplice statements admitted under

17   California Evidence Code ("Evidence Code") section 1235 (which codifies the hearsay

18   exception for prior inconsistent statements), even though these statements are not within the

19   traditional definition of "testimony" in that they are not given under oath.  Subsequent

20   California Supreme Court opinions have emphasized, however, that <u>Belton</u> did not hold that

21   <u>all</u> out-of-court statements should be interpreted as "testimony" necessitating  the application

22   of section 1111's corroboration requirement, but rather that:

23          'testimony' within the meaning of section 1111 includes all oral statements
            made by an accomplice or coconspirator under oath in a court proceeding and
24          all out-of-court statements of accomplices and co-conspirators used as
            substantive evidence of guilt **which are made under suspect circumstances. .**
25          **.** . On the other hand, when the out-of-court statements are not given under
            suspect circumstances, those statements do not qualify as 'testimony' and hence
26          need not be corroborated under section 1111.

27   <u>People v. Williams</u>, 16 Cal. 4th 153, 245 (1997) (citations omitted) (emphasis added).

28

1    In the instant case, co-defendant Miller's statements were not made under suspect

2  circumstances.  She was not being questioned by the police or by any other person arguably

3  connected with law enforcement who might have been able to secure more lenient treatment

4  for her.  Moreover, the incentive for blame-shifting, at least in its traditional form, was

5  largely absent from this case -- because evidence establishing Miller's prior false

6  representations was detrimental to both Miller and petitioner's prospects at trial.  Given these

7  circumstances,  Miller's statements to Brayevich did not qualify as "testimony" under section

8  1111, and therefore did not need to be corroborated in order to be admissible.

9    Petitioner next argues that Miller's recorded statement was inadmissible because "co-

10  defendant's statements were made by co-defendant only after petitioner already was in

11  custody, and thus they obviously were not part of any ongoing conspiracy so as to be

12  admissible against petitioner under the coconspiratory exception to the hearsay rule

13  contained in section 1220 of the California Evidence Code."  (Petition, December 18, 2001,

14  ("Petition"), at 10-11, 11-16.)  As respondent points out, however, Miller's statements were

15  not offered to show the truth of the matters asserted (i.e., that Miller was a virgin, had no

16  children, and lived alone).  Rather, they were introduced to corroborate Brayevich's

17  testimony that Miller had made false representations to him regarding her personal

18  circumstances.  As such, the statements did not constitute hearsay, and thus the applicability

19  of an exception to the hearsay rule is irrelevant.[5]

20    In sum, the statements made by co-defendant Miller to Brayevich during their

21  conversation of September 22, 1995, were admissible against petitioner to corroborate

22  Brayevich's testimony that co-defendant had earlier made false representations. Moreover,

23  the statements corroborated Brayevich's testimony regarding the earlier false representations

24  allegedly made to him by Miller.  In any event, the state appellate court found that evidence

25

26    [5]Nor does the admission, on a corroboration theory, of co-defendant's statements during the September 22, 1995, conversation against petitioner run afoul of the prohibition against charging petitioner with acts taken by co-defendant Miller subsequent to petitioner's

27  arrest. The statements were not admissible as acts of Miller chargeable to petitioner, rather they were admissible to show that earlier acts of Miller - properly chargeable to petitioner

28  under the uncharged conspiracy doctrine - had taken place.

1  of the Wyss, Dodd, and McAllister incidents  was sufficient to meet section 532(b)'s

2  corroboration requirement, and, as explained above, this court agrees.

3       In addition to examining petitioner's corroboration argument, the court has also

4  independently reviewed the voluminous record in this case to determine whether, "after

5  viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

6  could have found the essential elements of the crime beyond a reasonable doubt." Jackson,

7  443 U.S. at 319.  There was ample evidence from which a rational juror could have found the

8  elements of theft by false pretenses proven beyond a reasonable doubt.[6]

9       Therefore, petitioner has failed to demonstrate that the state appellate court's decision

10  was contrary to clearly established United States Supreme Court precedent, or involved an

11  unreasonable application of such precedent.  28 U.S.C. § 2254(d).  Accordingly, petitioner is

12  not entitled to habeas relief on this claim.

13       2.    Instructions On Penal Code Section 532(b)'s Corroboration Requirement

14       Petitioner claims that the trial court's instructions failed to adequately inform the jury

15  of the nature and amount of evidence necessary to corroborate the existence of a false

16  pretense for a conviction of theft by false pretenses pursuant to California Penal Code §

17  532(b).  Respondent contends that this claim is procedurally defaulted.

18       Federal habeas review of a claim is barred in all cases where a state prisoner has

19  defaulted his federal claim in state court due to an independent and adequate state procedural

20  rule.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  To preclude federal review, a state

21  court must have relied on a procedural bar as the basis for its disposition of the case.  Harris

22  v. Reed, 489 U.S. 255, 261-62 (1989).

23       To determine whether petitioner's claim was procedurally barred, we look to the last

24  reasoned state court opinion - in this case the opinion of the California state court of appeals.

25  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  Citing California's rule that a party may

26  not complain on appeal that an instruction correct in law and responsive to the evidence was

27

28  _____
     [6]Petitioner does not challenge the sufficiency of evidence supporting the great taking
     enhancement.

1    too general or incomplete unless the party has requested appropriate clarifying or amplifying

2    language, the court of appeal held that because the instruction was correct in law, and

3    because the defendant had not requested amplifying or clarifying language, petitioner had

4    waived this claim on appeal.  Slip Op. at  15:3-7.

5         California's rule that a party's failure to request the amplification or clarification of a

6    jury instruction at trial waives the right to object to the adequacy of the instruction on appeal

7    is an "independent" state procedural rule in that it stems solely from California law.  See,

8    e.g., People v. Guiun, 18 Cal. 4th 558, 570 (1998); People v. Byrnes, 30 Cal. 206, 208

9    (1866).[7]  A burden-shifting analysis is applied to resolve the issue of adequacy: "Once the

10   state pleads the affirmative defense of an independent and adequate state procedural bar, the

11   burden to place that defense in issue shifts to the petitioner.  This must be done, at a

12   minimum, by specific allegations by the petitioner as to the adequacy of the state procedure."

13   Bennett v. Mueller, 322 F.3d 573, 384 (9th Cir. 2003).  In the instant case, as stated above,

14   respondent pled the affirmative defense of an independent and adequate state procedural bar,

15   shifting the burden to place that defense at issue to petitioner.  Petitioner, however, has not

16   made any specific allegations as to the inadequacy of the state procedural rule.  Therefore, he

17   has not placed the adequacy of the state's procedural bar at issue.

18        Because the procedural rule relied upon by the California appellate court is

19   "independent" for purposes of procedural default, and because petitioner has not placed the

20   rule's "adequacy" at issue, the court concludes that this claim is procedurally defaulted.

21   State court prisoners can under limited circumstances obtain federal habeas review of

22   procedurally defaulted claims by demonstrating cause for the default and actual prejudice as

23   _____

24        [7]In his papers, respondent conflates the rule that a party's failure to request the
     amplification or clarification of a jury instruction at trial waives the right to object to the
25   adequacy of the given instruction on appeal with California's often cited "contemporaenous
     objection rule", set forth in California Evidence Code § 353.  The plain language of section
26   353, however, refers only to objections to evidence, not to jury instructions.  In light of the
     conclusion, below, the court need not resolve for purposes of this petition whether the two
27   rules should in fact be considered the same for purposes of procedural default.  Cf. Vansickel
     v. White, 166 F.3d 953, 957-58 (9th Cir. 1999) (California's contemporaneous objection rule
28   is independent and adequate for purposes of procedural default analysis).

1  a result of the alleged violation of federal law, or by showing that failure to consider the

2  claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 729-30.  A

3  petitioner must establish factual innocence to show that a fundamental miscarriage of justice

4  would result from application of a procedural default.  See Gandarela v. Johnson, 286 F.3d

5  1080, 1085 (2002).

6        In his traverse, petitioner concedes that he cannot meet the cause and prejudice

7  standard.  Traverse at 10:14-21.  He contends, however, that he meets the "fundamental

8  miscarriage of justice" test because the failure to instruct, "resulted in the conviction of one

9  who is actually innocent."  Traverse at 10:21-26.  Petitioner, however, submits no evidence,

10  and makes no argument supporting this position outside of the conclusory assertion that he is

11  actually innocent.  For the reasons discussed above, that sufficient evidence existed in the

12  trial record to support petitioner's conviction of theft by false pretenses, and petitioner's

13  failure to offer any evidence contradicting the evidence admitted at trial, the court rejects his

14  conclusory assertion of actual innocence.

15        Accordingly, petitioner is not entitled to habeas relief on this claim.

16        3.    Sufficiency of Evidence Supporting Conviction For Credit Card Forgery

17        Petitioner next contends that the evidence adduced at trial was insufficient to support

18  his conviction of credit card forgery with respect to the victim, Wilbur Johnson.  Liberally

19  construed, the petition advances four separate arguments supporting this insufficiency of

20  evidence claim.  First, petitioner asserts that the offense of credit card forgery did not occur

21  because, "the only individual [who] signed a name in relation to any type of credit card

22  transaction was the elderly Wilbur Johnston himself."[8]  Petition at.19:11-14.  Second,

23  petitioner appears to suggest that no crime occurred in the absence of a net loss to victim

24  Johnson.  Third, petitioner claims that there was insufficient evidence at trial to establish that

25  he was the person who used the fictitious name "Michael Marco."  Finally, petitioner argues

26  that the prosecution failed to establish the "lack of authority" element of credit card forgery.

27

28        [8]Wilbur Johnson also went by the name "Wilbur Johnston."  RT at 1158:7-9.

1    As explained above, a federal court reviewing collaterally a state court conviction

2  does not determine whether it is satisfied that the evidence established guilt beyond a

3  reasonable doubt.  Payne, 982 F.2d at 338.  The federal court "determines only whether, 'after

4  viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

5  could have found the essential elements of the crime beyond a reasonable doubt.'"  See id.

6  (quoting Jackson, 443 U.S. at 319). Only if no rational trier of fact could have found proof of

7  guilt beyond a reasonable doubt, may the writ be granted.  See Jackson, 443 U.S. at 324.

8    Under California law, the elements of credit card forgery are: "(1) a person signed the

9  name of another or fictitious person to any [sales slip, sales draft, or instrument for the

10  payment of money which evidences an access card transaction]; (2) the person had no

11  authority to sign the name of the other person; (3) the person knew that he did not have the

12  authority to sign the other's name; and (4) the person signed the instrument with the specific

13  intent to defraud another person."  Cal. Penal Code § 484f(b); CALJIC No. 15.00.

14    Petitioner first argues that the offense of credit card forgery did not occur because "the

15  only individual [who] signed a name in relation to any type of credit card transaction was the

16  elderly Wilbur Johnston himself."  Petition at 19:11-14.  Respondent disputes the contention

17  that Wilbur Johnson was the only person to sign a document that falls within the scope of

18  Penal Code § 484f(b).  Answer at 20:7-13.

19    As summarized in the background section above, the evidence admitted at trial

20  showed that a man accompanied Johnson when Johnson bought a cellular telephone on June

21  12, 1995.  RT at 1099-1123.  The same man returned the phone for a store credit which he

22  applied to a more expensive digital cellular phone, signing the name "Michael Marco" to a

23  receipt to receive the store credit and to a second receipt verifying that the returned telephone

24  was the item originally purchased.  RT at 1102-14.  The man came back a third time to return

25  the items and purchase a yet more expensive cellular telephone and telephone accessories,

26  again signing the name Michael Marco and having the initial purchase credited to his new

27  purchase.  RT at 1102-14; People's Trial Exhibit #38, lodged July 28, 2003.

28

1    The appellate court found that the store credit receipts signed by "Michael Marco"

2   allowing Johnson's initial purchase amount of $221.53 to be applied toward Marco's

3   subsequent purchases constituted, "instrument[s] for the payment of money which evidences

4   an access card transaction" for the purposes of California Penal Code § 484f(b).  This

5   determination of state law is binding on this court.  See Bradshaw v. Richey, 546 U.S. 74, 76

6   (2005) (state court's interpretation of state law, including one announced on direct appeal of

7   challenged conviction, binds a federal court sitting in habeas corpus).  Petitioner has

8   presented no authority, nor are we aware of any, to contradict the appellate court's

9   construction of section 484f(b) to include these types of store credit receipts.  Therefore,

10   petitioner is incorrect that there was no evidence that anyone other than Johnson signed a

11   credit card instrument within the meaning of California Penal Code § 484f(b).

12    Petitioner's second argument is that, when the name Michael Marco was signed, "it

13   only pertained to a transaction where there was a return of property from a prior occasion

14   with the acquisition of replacement items where the difference was paid for in cash."

15   Petition at 19:18-21.  That there may have been no net loss to Johnson, inasmuch as the

16   person using the name Michael Marco paid in cash the difference between the first

17   apparently authorized cellular telephone purchase and the subsequent, more expensive

18   cellular telephones and accessories, does not mean no crime occurred.  The salient element of

19   section 484f(b) is the signing of the name of another person or a fictitious person in

20   connection with a credit card transaction.  2 Witkin, Cal.Crim. Law 3d (2000) § 192 at 219.

21   "The existence of a specific intent to defraud is an essential element of the crime of forgery,

22   but **it is not necessary** to complete the crime that any person be actually defrauded **or suffer**

23   **a loss** by reason of the forgery."[9] CALJIC 15.03 (emphasis added).  Accordingly, petitioner's

24   argument that he could not be convicted in the absence of a net loss to Johnson fails.

25

26

27        [9]The use note accompanying CALJIC 15.03, the standard jury instruction for
California's general forgery statute, Penal Code section 470, states that the instruction should
be adapted and used for violations of Penal Code section 484f(b) (the credit card forgery

28   statute).

1    Third, petitioner contends that there is insufficient evidence to support a finding that

2    he "in fact was the individual who used the name Michael Marco in connection with the cash

3    transactions that occurred on June 28, 1995, and August 16, 1995." Petition at 20:4-7.   The

4    California appellate court rejected this contention as follows:

> The following evidence established that Harris was Michael Marco:  a receipt signed by "Mr. Marco" was found in the kitchen cupboard of Harris's residence at 537 Sunnyvale Avenue.  There were cellular telephone charges on Johnston's credit card accounts which corresponded to telephone numbers frequently called by defendants including Miller's parents and Brayevich.  Furthermore Harris used the name Michael Marco or Michael Marcos to rent the house on Sunnyvale Avenue and he introduced Miller as Gina Marco, his wife.  He signed the lease Michael Marco.  He also identified himself by that name when he purchased [a] 1977 Mercedes.

Slip Op. at 19-20.  The above evidence described by the state appellate court constitutes

sufficient evidence from which a rational fact-finder could find beyond a reasonable doubt

that petitioner was the person who signed the fictitious name "Michael Marco" to the store

credit receipts.

    Finally, petitioner argues that the prosecution failed to establish the "lack of authority"

element of credit card forgery because it did not prove that Johnson did not give "Michael

Marco" authority to sign store credit receipts allowing Johnson's initial purchase amount to

be applied towards Marco's subsequent purchase.  The prosecution need not prove the lack of

authority to sign a fictitious name, however.   As explained in California state court opinions

analyzing California's general forgery statute, Penal Code section 470[10]:

> Such an argument is pure sophistry.  The requirement that there be proof of lack of authority applies where the name of an actual person is signed, not to the situation where a fictitious name is signed.  'The proof of lack of authority to sign the name of an *actual person* is necessary to prove the falsity of the instrument; if the person whose name is signed to the instrument is fictitious, proof of this fact is likewise proof of the falsity of the instrument.  Thus, 'while one may sign a fictitious name which he has adopted for innocent purposes without being guilty of forgery, . . . if . . . fraud is shown, the fact that the name had been previously assumed by the one signing it [for any purpose] . . . will not prevent the signature being a forgery . . . .

---

[10] As explained in note 14, above,  the standard jury instruction for California's general forgery statute (which includes the 'lack of authority' element) applies to section 484f(b) prosecutions.

1   Wutzke v. Bill Reid Painting Service, 151 Cal. App. 3d 36, 41 (1984) (emphasis in original)

2   (citations omitted); see also People v. Porter, 136 Cal. App. 2d 461, 467 (1955).  In the

3   instant case, ample circumstantial evidence showed that "Michael Marco" was a fictitious

4   person created by petitioner for use as one of his aliases.  Because "Michael Marco" was a

5   fictitious name, it was not incumbent upon the prosecution to prove his 'lack of authority' to

6   sign this name.

7           In addition to rejecting the four specific arguments advanced by petitioner in support

8   of his claim that insufficient evidence supported his conviction for credit card forgery, the

9   court has independently reviewed those portions of the record relating to this conviction.

10  Based on such review, the court finds that a rational trier of fact could have found proof of

11  guilt beyond a reasonable doubt.  Therefore, petitioner has failed to establish that the state

12  appellate court's decision was contrary to clearly established United States Supreme Court

13  precedent, or involved an unreasonable application of such precedent.

14          Petitioner is not entitled to habeas relief on this claim.

15          4.      Sufficiency of Evidence Supporting Grand Theft Conviction (Wilbur Johnson)

16          Petitioner next claims that there was insufficient evidence to support his conviction

17  for grand theft from Wilbur Johnson.  The state appellate court rejected this claim, finding

18  that sufficient circumstantial evidence existed to support this conviction.

19          As explained above, a federal court reviewing collaterally a state court conviction

20  does not determine whether it is satisfied that the evidence established guilt beyond a

21  reasonable doubt.  Payne, 982 F.2d at 338.  The federal court "determines only whether, 'after

22  viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

23  could have found the essential elements of the crime beyond a reasonable doubt.'"  See id.

24  (quoting Jackson, 443 U.S. at 319). Only if no rational trier of fact could have found proof of

25  guilt beyond a reasonable doubt, may the writ be granted.  See Jackson, 443 U.S. at 324;

26  Payne, 982 F.2d at 338; Miller, 757 F.2d at 992-93; Bashor, 730 F.2d at 1239.

27  Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain

28

1  a conviction.  Walters, 45 F.3d at 1358.  Mere suspicion and speculation, however, cannot

2  support logical inferences.  Id.

3      Under California law, the crime of grand theft can be prosecuted on multiple theories,

4  including larceny, embezzlement, larceny by trick or device, and theft by false pretenses.

5  CALJIC 14.00; Cal. Penal Code § 484.  Petitioner contends that the jury was instructed only

6  on a theory of theft by larceny, and not on the theories of theft by trick or device or theft by

7  false pretenses.  He apparently claims that, because the jury was not instructed on a theory of

8  theft by false pretenses, his conviction cannot be upheld on this theory.  Petitioner also

9  argues that the record contains insufficient evidence to support his conviction under any of

10 the theories that fall within the scope of California's grand theft statute.  The appellate court

11 rejected these arguments as follows:

12          In California, the ancient common law distinctions between the theories
           of larceny by trick and theft by false pretenses no longer exist by statute; under
13         section 484, there is simply one consolidated crime of theft, which the jury may
           find upon either theory, if there is an 'unlawful taking'.  (§ 952).  As stated by
14         our Supreme Court in People v. Ashley, (1954) 42 Cal.2d 246, 258, 'The
           purpose of the consolidation was to remove the technicalities that existed in the
15         pleading and proof of these crimes at common law . . . Juries need no longer be
           concerned with the technical differences between the several types of theft, and
16         can return a general verdict of guilty if they find that an 'unlawful taking' has
           been proved.  We note that another recent larceny case . . . supports our
17         analysis:  'In the instant action it was irrelevant whether defendant obtained the
           dress by trick or intimidation of the store employees.  The end result was that
18         he left the store with property he had not paid for.'  People v. Counts, (1995)
           31 Cal.App.4th 785, 793.
19          In our case there is substantial, albeit circumstantial, evidence to
           establish [petitioner's] intent to commit theft from Johnston as established by
20         his involvement in the conspiracy with Gina Miller to defraud Brayevich and
           others. (Evid. Code § 1101, subd. (b).)  "Both direct and circumstantial
21         evidence are acceptable as means of proof.  Neither is entitled to any greater
           weight than the other." (CALJIC No. 2.00).  There is no reasonable
22         explanation for how [petitioner] came to acquire thousands of dollars of
           property charged to Johnston's account, absent fraud.  (Cf. People v. Silberman
23         (1989) 212 Cal.App.3d 1099, 1116-1117.)  Johnston was living in retirement
           on a fixed income and was necessarily frugal.  There is no evidence that
24         Johnston owed a debt to petitioner; petitioner was not a relative or known to be
           a friend (whether as "Marco," "Harris," or any other name) who would be the
25         normal object of Johnston's bounty.  The only reasonable explanation for
           Johnston's unusual expenditures was that he was another victim of Harris's and
26         Miller's common scheme or plan to defraud vulnerable old men.  Substantial
           evidence supports the conviction.

27

28

People v. Miller, No. H017020, Slip Op. (Cal.Ct.App. June 7, 2000), as modified by People v. Miller, No. H017020, Slip Op. at 3-4 (Cal.Ct. App. July 6, 2000).

First, petitioner's argument that the jury was not instructed on a theory of theft by false pretenses is contradicted by the record.  Although the trial judge's oral instructions regarding this count focused primarily on the theory of theft by larceny the trial judge's instruction that, "[t]he crime of theft may consist of theft by larceny or theft by false pretenses" permitted the jury to also consider the theory of theft by false pretenses.  RT at. 2550:22-23.  Accordingly, petitioner's conviction for grand theft could have rested upon theories of either larceny or false pretenses.

Juries need not specify the theory under which they return a conviction of grand theft, but at least one such theory must be supported by the record:

> When the formerly distinct offenses of larceny, embezzlement, and obtaining property by false pretenses were consolidated in 1927 into the single crime of 'theft' defined by Penal Code section 484[11], most of the procedural distinctions between those offenses were abolished.  But their substantive elements were not:  'The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses.'

People v. Davis, 19 Cal. 4th 301, 304-05 (1998) (citing People v. Ashley, 42 Cal. 2d 246, 258 (1954)) (footnote added).  With respect to larceny, the elements "are well settled:  the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass (5) with intent to steal the property, and (6) carries the property away.  The act of taking personal property from the possession of another is always a trespass unless the owner consents to the taking freely and unconditionally or the taker has a legal right to take the property." Id. at 305 (citations and footnotes omitted).

As detailed in the background section, Johnson purchased women's beauty products from Bare Escentuals, women's and children's clothing from Mervyn's and The Emporium,

---

[11]California Penal Code § 484 defines theft; sections 485, 486, and 487 set forth the degrees of theft and define grand theft.

1   and furniture from the Bedroom Store, in addition to the cellular telephone later returned by

2   "Michael Marcos."  The record is bereft, however, of direct evidence establishing that the

3   relevant property was taken "by means of trespass."  In addition, there was no evidence

4   showing that Johnson called the police to report any theft, that he protested any of the

5   pertinent charges with his credit card companies, or that he complained to his son about any

6   of the purchases.  Moreover, as to the Circuit City cellular telephone purchase, discussed at

7   length above, the evidence presented showed that Johnson and petitioner visited the store

8   together, and that Johnson voluntarily purchased the cellular telephone.  RT at 1099-1123.

9   The only circumstantial evidence supporting a theft by larceny theory was the evidence

10  admitted pursuant to Evidence Code section 1101(b) that petitioner had committed acts of

11  misconduct with respect to other individuals, and the testimony of Johnson's son that

12  Johnson's spending habits had changed.  Evidence of Johnson's decision to start buying new

13  and more expensive items, even when considered with the 1101(b) evidence, is, without

14  more, insufficient for a reasonable fact-finder to conclude beyond a reasonable doubt that

15  those items were 'stolen', that is, taken without Johnson's consent.  Accordingly, there was

16  insufficient evidence to convict petitioner of grand theft from Johnson on a larceny theory.

17          With respect to the theory of theft by false pretenses, a conviction requires proof that

18  (1) the defendant made a false pretense or representation to the owner of property, (2) with

19  the intent to defraud the owner of that property, and (3) the owner transferred the property

20  to the defendant in reliance on the representation.  <u>Wooten</u>, 44 Cal. App. 4th at 1842-43.

21  The evidence that petitioner misrepresented his name to Johnson as "Michael Marco" is

22  sufficient to satisfy the first element, that petitioner made a false pretense or representation

23  to the owner of the property.  Evidence of petitioner's conduct during his relationship with

24  Nicholas Brayevich, as well as evidence of his uncharged conduct with respect to Ned

25  Wyss, constitutes sufficient circumstantial evidence from which a rational juror could

26  conclude beyond a reasonable doubt that petitioner intended to defraud Johnson, satisfying

27  the second element.

28

1    However, there is insufficient evidence to satisfy the third element, namely that

2    reliance on the false representation.  "A victim does not rely on a false representation if

3    'there is no causal connection shown between the [representation] alleged to be false' and

4    the transfer of property."  Id.  Because the only false representation discernible from the

5    record pertinent to this charge is petitioner's misrepresentation of his name as "Michael

6    Marco," the record must contain evidence sufficient to establish that Johnson transferred

7    property to petitioner on that misrepresentation.  A review of the record reveals no evidence

8    that Johnson relied on this particular fact when deciding to purchase gifts for petitioner and

9    co-defendant Miller.  Respondent argues, and the state appellate court found,  that evidence

10   of the change in Johnson's spending habits and of the other "schemes" engaged in by

11   petitioner and co-defendant Miller was sufficient to support petitioner's conviction.  The

12   record reveals no causal connection, however, between Johnson's belief that petitioner's

13   name was "Michael Marco" and his decision to alter his spending habits.  Of course, the

14   jury may have speculated that Johnson would not have made gifts to petitioner if he had

15   known that petitioner was lying about his name.  While a conviction may properly rest upon

16   logical inferences drawn from circumstantial evidence, mere suspicion and speculation,

17   however, cannot support such logical inferences.  Walters, 45 F.3d at 1358.[12]  Evidence

18   relating to petitioner's interactions with other elderly gentlemen do not amount to proof of

19   _Johnson's_ state of mind (as opposed to the state of mind of petitioner and Miller) when he

20   purchased the items for petitioner and Miller.  As there was not sufficient evidence from

21   which a rational jury could find beyond a reasonable doubt that Johnson relied upon

22

23

24

25

26

27      [12]Nicholas Brayevich, for instance, admitted on cross-examination that, during his
relationship with Miller, he knew that she used multiple names.  He testified that her use of
different names did not diminish his affection for her or cause him to stop giving her (or
28   petitioner) gifts.  RT, p. 322, ll. 8-22.

petitioner's false representations, there was not sufficient evidence to support petitioner's conviction for grand theft of Johnson based on a theory of theft by false pretenses.[13]

In sum, after viewing the evidence in the light most favorable to the prosecution, no rational trier-of-fact could have found the essential elements of grand theft based upon either a theory of larceny or of false pretenses. The state appellate court's decision to the contrary amounted to an unreasonable application of clearly established United States Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d). Accordingly, petitioner is entitled to federal habeas relief on his conviction of Count Five, namely grand theft of Wilbur Johnson..

5.   Admission of Uncharged Acts of Misconduct

Petitioner next contends that the trial judge violated his federal due process rights by erroneously admitting into evidence the Wyss, Dodd, and McAllister incidents. The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. Id.. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

A habeas petitioner who challenges a state court's admission into evidence of prior acts of misconduct is not entitled to habeas corpus relief unless the state court's admission

---

[13]Petitioner also argues that the evidence of Johnson's receipts and charge account statements was not admitted for the truth of the matter asserted, and that there was no showing that there was, "the actual payment of money by Wilbur Johnston for the amounts and items reflected in that paperwork." Petition, p. 22:8-10. In light of the conclusion reached herein, it is unnecessary for the court to address petitioner's additional arguments.

of this evidence violated the petitioner's federal due process right to a fair trial under the Constitution.  See Engle v. Isaac, 456 U.S. 107, 119 (1982).  When evaluating the due process claim, the habeas court considers the relevance of the evidence, the trial court's use of limiting instructions, and the jury's ability to weigh the credibility of the witnesses to the uncharged misconduct.  Gordan v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) (admission of uncharged crimes did not violate due process where trial court gave limiting instruction to jury, jury was able to weigh witnesses' credibility and evidence was relevant to the defendant's intent)

Respondent first argues that the uncharged misconduct evidence was relevant under Evidence Code § 1101 ("section 1101") to show petitioner and Miller's criminal intent. Under section 1101, evidence of a prior crime or bad act is admissible so long as it shows not only criminal disposition (i.e., bad character), but is relevant to prove a fact such as motive, opportunity, intent, plan, or knowledge.  Cal. Evid. Code § 1101(b); People v. Ewoldt, 7 Cal. 4th 380, 393 (1994).  To prove a violation of Penal Code section 487, the theft statute under which petitioner was prosecuted as to both Nicholas Brayevich and Wilbur Johnson, the government must prove that the defendant had a "specific intent to defraud" the victim.  CALJIC 14.10.

Petitioner contends that the uncharged acts were not admissible under section 1101 because the issue of intent was not in dispute at trial.  Petition at 24:24-25:2.  Petitioner points to closing argument, when defense counsel argued that Brayevich had not been defrauded, but rather that he, Miller, and petitioner had had mutually satisfying relationships which brought companionship and sexual pleasure to Brayevich, and money and material goods to his client and co-defendant.  Trial counsel vigorously argued that Brayevich's decision to part with his money was based on the satisfaction he received from these relationships, rather than on the misrepresentations made by co-defendant and petitioner.

1      While trial counsel may have tacitly conceded that his client was out to get all he

2  could from Brayevich, a morally distasteful state of mind, perhaps, but not necessarily a

3  criminal one, counsel did not concede, and the prosecution therefore had the burden to

4  prove, that petitioner specifically intended to defraud Mr. Brayevich in order to do so.  This

5  is a critical distinction.  Petitioner's reliance on People v. Bruce, 208 Cal. App. 3d 1099

6  (1989) to support his argument that evidence of the Wyss, McAllister and Dodd incidents

7  should not have been admitted pursuant to section 1101 is misplaced.  In Bruce, the trial

8  court admitted evidence of an uncharged rape despite appellant's repeated and specific

9  disavowal of any defense other than actual consent by the victim; the appellate court

10  reversed Bruce's conviction, finding that the uncharged rape had no tendency to prove or

11  disprove whether the victim of the charged rape had consented to intercourse with the

12  appellant, and holding that the evidence was not admissible on the issue of appellant's intent

13  because appellant had not asserted a defense that put his state of mind at issue.  Bruce, 208

14  Cal. App. 3d at 1105-06.  As explained above, in the case at bar, petitioner's state of mind

15  was at issue because the prosecution had the burden of proving petitioner's intent to defraud

16  Mr. Brayevich.

17      Petitioner further argues that the charged incidents and uncharged incidents were so

18  dissimilar that the uncharged incidents evidence had no tendency to prove his intent with

19  regard to Mr. Brayevich.  However, in the uncharged incidents, as in the charged incidents,

20  Miller (and petitioner, in the case of Ned Wyss) repeatedly misrepresented Miller's name

21  and her circumstances in an obvious attempt to make Miller more attractive and

22  sympathetic to elderly gentlemen, and to conceal her true identity.[14]  This rendered the

---

[14]Petitioner also argues that it was error to admit evidence of the incidents involving Dodd and McAllister because he "was in custody at the time of the incidents and was in no way participating in those matters."  Petition at 27:.4-8.  As the appellate court pointed out, however:

> The modus operandi of the criminal scheme in which both defendants participated was that Miller would cast her lures into the victims' water and hook the victims when they bit.  Harris would come along later and help gut and bleed them.  Whether Harris was temporarily unable to personally bleed

1    evidence of the uncharged acts relevant to show petitioner's intent.  "If a person acts

2    similarly in similar situations, he probably harbors the same intent in each instance . . . and

3    such prior conduct may be relevant circumstantial evidence of the actor's most recent intent.

4    The inference to be drawn is not that the actor is disposed to commit such acts; instead, the

5    inference to be drawn is that, in light of the first event, the actor, at the time of the second

6    event, must have had the intent attributed to him by the prosecution."  People v. Gallego, 52

7    Cal. 3d 115, 171 (1991).

8         Respondent also asserts that the Wyss, Dodd, and McAllister incidents were

9    admissible to corroborate the testimony of Nicholas Brayevich.   Petitioner disagrees,

10   arguing that the Wyss, Dodd, and McAllister incidents were insufficiently similar to the

11   Brayevich and Johnson incidents to provide corroboration.[15]  For the reasons discussed

12   above, however, the testimony of Messrs. Wyss, Dodd, and McAllister is relevant (and

13   sufficient to corroborate) Brayevich's allegations that Miller and petitioner misrepresented

14   Miller's identity, residential status, and the nature of Miller's relationship with petitioner.

15   We reject petitioner's assertion to the contrary.

16        In sum, the evidence relating to the Wyss, Dodd, and McAllister incidents was

17   relevant both to show petitioner and Miller's intent under Evidence Code § 1101, and to

18   corroborate Brayevich's testimony.  Moreover, the trial judge properly instructed the jury

19   that it was not to consider the uncharged misconduct to prove the bad character or

_____

21        and gut Dodd and McAllister is irrelevant to the admissibility of the evidence.
         Each incident reveals common characteristics shared by the schemes against all
22       the victims and establishes their frequency and success.  '[T]he recurrence of a
         similar result . . . tends (increasingly with each instance) to negative accident or
23       inadvertence or self-defense or good faith or other innocent mental state, and
         tends to establish (provisionally, at least, though not certainly) the presence of
24       the normal, i.e., criminal, intent accompanying each such act ... People v.
         Ewoldt, (1994) 7 Cal. 4th 380, 402, quoting 2 Wigmore, Evidence (Chadbourn
25       rev. ed. 1979) § 302, p. 241).

26   People v. Miller, No. H017020, Slip Op. at 22 (Cal.Ct.App. June 7, 2000).

27        [15]  Petitioner makes this argument in the portion of his brief that argues that no
     competent evidence corroborated Brayevich's testimony regarding co-defendant Miller's oral
28   false pretenses.  Petition at 11:5 -13:17.

disposition of petitioner and Miller, but could only consider it as it related to the issue of criminal intent.  RT at 2544.  Juries are presumed to follow the court's instructions.  <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000).  In addition, the jury had an opportunity to observe and weigh the credibility of Mssrs. Wyss, Dodd, and McAllister, all three of whom testified in person at petitioner's trial.  Consequently, petitioner's due process right to a fair trial was not violated by the trial court's admission of evidence of the alleged uncharged acts of misconduct.

Accordingly, petitioner is not entitled to habeas relief on this claim.

6.    <u>Sufficiency of Evidence Supporting Conviction for Attempting to Dissuade a Witness</u>

Petitioner next claims that there was insufficient evidence presented at trial to support his conviction for attempting to dissuade Nicholas Brayevich from testifying in furtherance of a conspiracy, pursuant to California Penal Code § 136.1.  Petitioner advances two arguments in support of this claim.  First, petitioner asserts that he could not have been acting in furtherance of a conspiracy to dissuade Brayevich because petitioner was in custody at the time of the acts on which his conviction is based occurred.  Second, he contends that section 136.1 is not broad enough to encompass his conduct.

As explained above, a federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  <u>Payne</u>, 982 F.2d at 338.  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  <u>See</u> <u>id.</u> (quoting <u>Jackson</u>, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  <u>See</u> <u>Jackson</u>, 443 U.S. at 324.

The elements of the charge against petitioner for intimidating Brayevich from testifying, in furtherance of a conspiracy, are as follows: (1) Nicholas Brayevich was a witness or a victim; (2) another person, with the specific intent to do so, attempted to

1  prevent or dissuade Brayevich from (a) attending or giving testimony at any trial,

2  proceeding, or inquiry authorized by law, (b) making a report of such victimization to any

3  peace officer, (c) causing a complaint or other accusatory pleading to be sought and

4  prosecuted, and from assisting in the prosecution thereof, or (d) arresting or causing or

5  seeking the arrest of any person; (3) that person acted knowingly and maliciously; and (4)

6  the act of preventing, dissuading, or the attempt thereto was in furtherance of a conspiracy.

7  See Cal. Penal Code § 136.1(c)(2); CALJIC No. 7.15.

8       Petitioner first argues that he could not have been acting in furtherance of a

9  conspiracy when he telephoned Brayevich and asked him to drop the pending charges

10  because he was in custody when he made the call.  Petitioner cites People v. Pic'l, 114

11  Cal.App.3d 824 (1991), disapproved of on other grounds by People v. Kimble, 44 Cal.3d

12  480 (1988), and People v. Saling, 7 Cal.3d 844 (1972), for the proposition that once some

13  of the co-conspirators have been arrested, the conspiracy has come to an end.  He also

14  quotes Sandez v. United States, 239 F.2d 239 (9th Cir. 1956), which states, "[w]e think that

15  the moment of any conspirator's arrest is decisive as to him, even if it should be maintained

16  that the arrest of the first conspirator is not conclusive as to all.  At that moment, the

17  conspiracy has been thwarted, and presumably no other overt act contributing to the

18  conspiracy can possibly take place at least so far as the arrested conspirator is concerned."

19  Petition at 31:21-32:3.  Petitioner's reliance upon Pic'l, Saling, and Sandez is misplaced.

20  These cases stand at most for the proposition that when a defendant is arrested and placed in

21  custody *such that he can perform no further acts in furtherance of the conspiracy,* the

22  conspiracy (as to him) is deemed to have ended.  These decisions do not, nor could they

23  sensibly, hold that the arrest of a conspirator halts a conspiracy when the object of the

24  conspiracy, such as dissuading a witness from testifying, can be accomplished or furthered

25  while the would-be conspirator is in custody.  In this case, petitioner was equipped to - and

26  did - take steps towards dissuading Brayevich from testifying while he was in custody.

27  Accordingly, petitioner's arrest in this case did not preclude him from acting in furtherance

28

1    of the conspiracy, and there was thus sufficient evidence to prove this element of the

2    offense.

3          Petitioner next contends that his conduct did not fall within the scope of California

4    Penal Code § 136.1.  Petitioner telephoned Brayevich from custody on September 16, 1995,

5    and said such things as "Nick, are you gonna come to court?  We already have enough

6    problems as it is";  "Oh, so they are gonna press charges? So that's what you're doing Nick?

7    Is that what you're gonna do?"; "Well can you drop whatever it is?" ;  "Can you just drop

8    whatever it is they want you to do?"; "Can you drop whatever they want you to do?"; "Drop

9    the charges?"[16]  Answer, Ex. C.  Petitioner argues that, "neither a victim, nor a witness, can

10   dictate to the prosecution to 'drop the charges'.  Thus, on its face [petitioner's] request to

11   Brayevich was a legal impossibility."  Petition at 30: 20-22.  Petitioner also argues that,

12   because he was already being investigated for  his role in the Brayevich theft at the time he

13   called Brayevich, "there is nothing in [his] conduct which would in any way dissuade or

14   prevent Brayevich from being a witness, from making a report, from causing an accusatory

15   pleading to be sought, from assisting in the prosecution of that accusatory pleading, [or]

16   from causing or seeking the arrest of petitioner."  Petition at 30:25 - 31:4.

17         The California appellate court rejected this claim as follows:

18         A review of the evidence lays this hopeful but sophistical argument to rest.
           Harris's telephone call to Brayevich plainly asks Brayevich to "drop charges",
19         i.e. for him to refuse to participate in the prosecution.  This was clearly an
           "attempt[] to prevent or dissuade any witness . . .from attending or giving
20         testimony at any trial, proceeding, or inquiry authorized by law." (§ 136.1,
           subd. (a)(2).)  Substantial evidence supported the conviction.
21

22   Slip Op. at 25.  During the September 16, 1995, conversation petitioner clearly attempted to

23   convince Brayevich to refrain from attending and testifying at any future court proceedings

     . It was not necessary for the prosecution to demonstrate the precise existence of the
24
     proceeding at which Brayevich  would be called as a witness.  Moreover, "there is . . . no
25
     talismanic requirement that a defendant must say 'Don't testify' or words tantamount thereto,
26
     in order to commit the charged [offense]...  As long as his words or actions support the
27

28         [16]Brayevich recorded this conversation and the recording was played for the jury.

1  inference that he attempted . . .to induce a person to withhold testimony, a defendant is

2  properly convicted of a violation of section 136.1". <u>People v. Mendoza</u>, 69 Cal.Rptr.2d

3  728, 735 (1997), <u>superseded by statute on other grounds</u>.

4     In addition to examining the two specific arguments advanced by petitioner in

5  support of this claim, the court has also independently reviewed the record, including a

6  transcript of the taped telephone call made by petitioner to Brayevich on September 16,

7  1995.  (Answer, Ex. C.)  The record contains ample evidence from which a jury could

8  rationally infer that petitioner attempted to dissuade Brayevich from testifying in

9  furtherance of a conspiracy. Therefore, the state appellate court's decision was neither

10 contrary to clearly established United States Supreme Court precedent, or involved an

11 unreasonable application of such precedent.  28 U.S.C. § 2254(d).

12     Petitioner is not entitled to habeas relief on this claim.

13

14     7.   <u>Failure To Instruct On Lesser-Included Offense</u>

15     Petitioner claims that the trial court violated his constitutional right to due process

16 by failing to instruct the jury on a lesser-included offense.  As discussed above, petitioner

17 was convicted of the felony offense of attempting to dissuade a witness in furtherance of a

18 conspiracy in violation of California Penal Code section 136.1(c)(2).  Petitioner was not

19 charged with, and the trial court did not *sua sponte* instruct on, the lesser-included offense

20 of 'misdemeanor'[17] attempting to dissuade a witness under California Penal Code section

21 136.1(b).  The California appellate court rejected petitioner's federal due process claim,

22 finding that there is no federal constitutional violation based on a failure to instruct on a

23 lesser-included offense in a non-capital case.

24

25

26     [17]Technically, section 136.1(b) is a "wobbler," i.e. it is punishable either as a
    misdemeanor or a felony with a maximum sentence of three years.  Subdivision (c) of section
27 136.1, the offense for which petitioner was charged and convicted, makes commission of an
    act set forth in subdivision (b) a felony punishable by a prison term of two, three, or four
28 years if the act is "in furtherance of a conspiracy."  Cal. Penal Code § 136.1(c)(2).

1    Although the Supreme Court has held that a failure to instruct on a lesser-included

2    offense may be constitutional error in a capital case, <u>Beck v. Alabama</u>, 447 U.S. 625, 638

3    (1980), it has not extended this holding to non-capital cases.   The Ninth Circuit accordingly

4    has held that the failure of a state trial court to instruct on lesser-included offenses in a non-

5    capital case does not present a federal constitutional claim.  <u>See</u> <u>Solis v. Garcia</u>, 219 F.3d

6    922, 929 (9th Cir. 2000).  Therefore, petitioner is precluded from federal habeas relief on

7    this claim.[18]

8        8.    <u>Instructions Defining Conduct and Mental State Necessary for Section</u>
            <u>136.1(c)(2) Conviction</u>

9

10   Petitioner next contends that the trial court gave conflicting and confusing

11   instructions as to the conduct and mental state necessary for a conviction under section

12   136.1(c)(2).  He claims that the instructions were so confusing that they violated his right to

     due process.

13

14   A challenge to a jury instruction solely as an error under state law does not state a

15   claim cognizable in federal habeas corpus proceedings.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S.

16   62, 71-72 (1991).  To obtain federal collateral relief for error in the jury charge, a petitioner

17   ─────────────────

18       [18]The Ninth Circuit has observed that a "defendant's right to adequate jury instructions
     on his or her theory of the case might, in some cases, constitute an exception to the general
19   rule" that the failure of a state trial court to instruct on lesser-included offenses in a non-
     capital case does not present a federal constitutional claim.  <u>Solis</u>, 219 F.3d at 929 (citation
20   omitted).  This observation is not, however, based on clearly established Supreme Court
     precedent within the meaning of 28 U.S.C. § 2254(d)(1).  <u>See, e.g.</u>, <u>Gilmore v. Taylor</u>, 508
21   U.S. 333, 343-44 (1993) (rejecting claim that allegedly defective jury instructions violated
     defendant's constitutional right to a meaningful opportunity to present a defense because the
22   cases in which Court has invoked this principle dealt either with the exclusion of evidence or
     the testimony of a defense witness).
23       In any event, petitioner would be entitled to habeas relief only if he could establish
     that the instructional error had a "substantial and injurious effect or influence in determining
24   the jury's verdict", or, in other words, that the error "resulted in actual prejudice".  <u>Brecht v.</u>
     <u>Abrahamson</u>, 507 U.S. 619, 938 (1993).  Petitioner's prejudice argument is premised upon
25   his assertion that he would have been convicted of only a misdemeanor because there was no
     evidence introduced at trial establishing that his dissuasion attempt was "in furtherance of a
26   conspiracy."  As discussed above, however, the evidence showed that, prior to petitioner's
     arrest, petitioner and Miller acted in tandem to manipulate Brayevich, petitioner and Miller's
27   respective attempts at dissuasion were made close in time, petitioner called Miller from
     custody (and spoke with her at some length) on the same day he called Brayevich,  Answer,
28   Exhibits C, D, E;  RT, at. 649-50, 856, 1957-68, 1973-76.  This amounted to ample evidence
     that petitioner and Miller conspired to dissuade Brayevich from testifying.

1   must show that the ailing instruction by itself so infected the entire trial that the resulting

2   conviction violates due process.  See id. at 72.  The defined category of infractions that

3   violate fundamental fairness is very narrow:  "Beyond the specific guarantees enumerated in

4   the Bill of Rights, the Due Process Clause has limited operation."  Id. at 73.

5          The trial court instructed the jury in the language of the statute as follows:

6          Section 136.1(c)(2) provides [that]:

7               A) Any person who does any of the following is guilty of a crime:

8               1.  Knowingly and maliciously prevents or dissuades any witness or
       victim from attending or giving testimony at any trial, proceeding or inquiry
9       authorized by law.
               2.  Knowingly and maliciously attempts to prevent or dissuade any
10      witness or victim from attending or giving testimony at any trial, proceeding,
       or inquiry authorized by law.
11

12              (B)  Every person who attempts to prevent or dissuade another person
       who has been the victim of a crime or who is witness to a crime from doing
13      any of the following is guilty of a crime:

14              1.  Making any report of such victimization to any peace officer or
       state or local law enforcement officer or probation or parole or correctional
15      officer or prosecuting agency or to any judge.
               2.  Causing a complaint, indictment, information, probation or parole
16      violation to be sought and prosecuted and assisting in the prosecution thereof.
               3.  Arresting or causing or seeking the arrest of any person in
17      connection with such victimization.

18
               Every person doing any of the acts described in (A) or (B) knowingly
19      and maliciously under any one or more of the following circumstances is
       guilty of a felony under any of the following circumstances:
20
               Where the act is in furtherance of a conspiracy.
21

22             Every person attempting the commission of a act -- strike that.

23             Every person attempting the commission of any act described in
       (A)(B) and (C) is guilty of the offense attempted without regard to success or
24      failure of such attempt.  The fact that no person was injured physically, or in
       fact intimidated, shall be no defense against any prosecution under this
25      section.

26             In order to prove such crime, the following elements must be proved:

27             1.  That a person knowingly and maliciously prevented or dissuaded or
28      attempted to prevent or dissuade another person who has been the victim of a

crime or a witness to a crime from doing one of the acts described in (A) and (B) above, and,

      2.  The act was in furtherance of a conspiracy.

The word 'knowingly' means with knowledge of the existence of the facts in question. Knowledge of the unlawfulness of an act or omission is not required. A requirement of knowledge does not mean that the act must be done with any specific intent.

The word 'maliciously' means a wish to vex, annoy or injure another person or an intent to do a wrongful act.

RT at 2552-2554.

    . . .

In the crimes charged in counts 1, 2, 3, 4, 5, and 6 of the information and any allegation of excessive taking in count 1, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the crime or allegation to which it relates is not committed.

The specific intent required in counts 2, 3 and 4 is the intent to prevent or dissuade the victim or witness from doing one of the acts described in the definition of the crime charged in those counts.

RT at 2559-60.

Petitioner first argues that the trial court gave the jury a "very mixed message" as to what conduct constitutes a violation of section 136.1(c)(2). He concedes that the court correctly instructed that a "violation of subdivision (c)(2) would occur if the conduct described in subdivisions (a) and (b) was done in furtherance of a conspiracy." Petition 35:16-18. He contends, however, that immediately prior to giving the correct instruction, the court incorrectly instructed the jury that a verdict of guilty could be returned if any of the conduct in subdivisions (a), (b), or (c)(2) occurred. Petition at 35:19-25. Petitioner argues that the allegedly conflicting instructions may have confused the jury regarding the conduct necessary for a conviction.

The appellate court rejected petitioner's claim, finding, after consideration of the entire charge to the jury, that there was not a reasonable likelihood that the jury misinterpreted the trial court's instructions in a way potentially unfavorable to the defense. Slip Op. at 25-27. This decision was not contrary to federal law, within the meaning of 28

1    U.S.C. § 2254(d)(1) because the appellate court applied the correct federal standard to

2    petitioner's claim.  See Estelle v. McGuire, 502 U.S. at 72 & n.4 (when deciding whether an

3    arguably ambiguous instruction is erroneous, the appropriate inquiry is "whether there is a

4    'reasonable likelihood' that the jury has applied the challenged instruction in a way that

5    violates the Constitution.").

6          The California appellate court also reasonably applied the applicable federal law 28

7    U.S.C. § 2254(d)(1).  Petitioner assails the portion of the instruction that states that,

8    "[e]very person attempting the commission of any act described in (A)(B) and (C) is guilty

9    of the offense attempted without regard to success or failure of such attempt."  RT, p. 2554.

10   He contends, in essence, that there is a reasonable likelihood that the jury interpreted

11   "(A)(B) and (C)" to mean (A) or (B) or (C).  Even when viewing the disputed language in

12   isolation, petitioner's interpretation is a strained one.  Moreover, it is well established that

13   the assailed instruction, "may not be judged in artificial isolation", but must be considered

14   in the context of the instructions as a whole and the trial record.  Cupp v. Naughten, 414

15   U.S. 141, 147 (1973).  Here, immediately after instruction with the (arguably) ambiguous

16   language, the trial court correctly and clearly set out the elements of the statute.  While the

17   instruction was not as clear as it might have been, when the instruction is read in the context

18   of the all of the instructions, there is not a reasonable likelihood that the jury interpreted this

19   instruction as permitting them to convict petitioner of violating section 136.1(c)(2) simply

20   by virtue of committing any act "in furtherance of a conspiracy."  Cal. Penal Code §

21   136.1(c)(2).  Consequently, the appellate court correctly applied Estelle's 'reasonable

22   likelihood' standard.

23         Petitioner next contends that the trial court gave contradictory instructions regarding

24   the mental state necessary for a section 136.1 conviction.  He argues that by defining

25   'knowingly' and 'maliciously', the court gave three different definitions of the necessary

26   mental state, and that two of the definitions were erroneous:  "[i]n short, the trial court

27   presented to the jury three different concepts as to the issue of intent in connection with a

28   violation of section 136.1 of the California Penal Code.  One was the correct concept (i.e. a

specific intent to prevent or dissuade), while the other two were the wrong concepts (i.e., (a) an intent to do any wrongful act, and (b) no specific intent at all.  Clearly, these contradictory instructions on specific intent, any wrongful act, and no specific intent at all, reasonably could have led the jury into a state of total confusion as to the necessary intent for a violation of section 136.1 of the California Penal Code."  Petition at 37:3-14.

Again applying the 'reasonable likelihood' standard, the California appellate court rejected this argument as follows:

> [T]he trial court correctly instructed the jury on the perpetrator's mental state: the acts must be committed both knowingly and maliciously and with a stated specific intent.  It correctly defined "knowingly" and "maliciously."  The court stated that "knowingly" does not require any specific intent, but it also stated that "maliciously required an intent to do a wrongful act."  It further instructed that the specific intent to dissuade a victim from doing one of the specified acts was necessary.  The court did not tell the jury that these requirements were in the disjunctive.  The plain meaning of the instructions was that the act must be both knowing, i.e., with knowledge of the surrounding circumstances, and with the intent to dissuade.  As respondent says, '[t]he two mental states are distinct -- one could act with an intent to dissuade but without sufficient knowledge of the circumstances.  On the other hand, one could have knowledge of the circumstances, but no particular intent to dissuade.'
> The relevant concepts were correctly defined for the jury.  There was no error.

People v. Miller, No. H017020, Slip Op. at 28 (Cal.Ct.App. June 7, 2000).

The trial court did not error by defining the concepts of knowingly and maliciously.  Under California law, trial courts are required to define 'knowingly' and 'maliciously' in section 136.1 prosecutions.  People v. Hallock, 208 Cal.App.3d 595, 610 (1989).  Moreover, the unambiguous meaning of the instructions was that petitioner could not be convicted under section 136.1 unless he had a specific intent to dissuade Brayevich from testifying.  Therefore, there is no reasonable likelihood that the jury interpreted the instructions as not requiring that intent.

Accordingly, petitioner is not entitled to habeas relief on this claim.

9.      Failure to Adequately Instruct Jury on Definition of Attempt

Petitioner next claims that the trial court's instructions did not adequately inform the jury of the possibility of convicting petitioner of attempting to dissuade a witness.

First, petitioner first argues that, because Brayevich was not actually prevented or dissuaded from testifying or otherwise assisting the prosecution, the jurors should have been instructed with CALJIC 6.00 -- which instruction would have permitted them to find petitioner guilty only of an attempted violation of section 136.1.  The California appellate court rejected this argument as follows:

> [T]here was no obligation on the trial court, as both defendants claim, to instruct sua sponte "on an attempt to commit a crime." (CALJIC 6.00)  The evidence does not show an attempted crime, namely that with the specific intent to dissuade a witness, each performed a direct ineffectual act toward the commission of the crime of dissuading or attempting to dissuade a witness. (Cf. CALJIC No. 6.00)  The evidence shows a completed crime.  Each defendant rang up Brayevich and asked him to drop charges.  Brayevich's refusal to cooperate did not make their conduct either more criminal or less criminal.  The trial judge did not err in not instructing the jury with CALJIC No. 6.00.

Slip. Op. at 24.  As correctly explained by the appellate court, petitioner violated section 136.1 by attempting to dissuade Brayevich from testifying, regardless of whether Brayevich was so dissuaded.  As the jury was instructed, it is immaterial whether the attempt to dissuade was successful.  See CALJIC No. 7.15.  As the record does not support an argument that petitioner only attempted to attempt to dissuade Brayevich, there was no need for an instruction on attempt.

Petitioner next argues that even if CALJIC 6.00 was not required, the trial court had a duty to clarify the meaning of section 136.1's attempt element, specifically as to the requirements of "intent" and an "act" in furtherance of that intent (not merely prepatory in nature).  Under California law, a trial court "has no sua sponte[19] duty to give amplifying or clarifying instructions . . . where the terms used in the instructions given are 'commonly understood by those familiar with the English language'." People v. Richie 28 Cal.App.4th 1347, 1360 (1994).  Petitioner has presented no authority suggesting that the word

---

[19]  Petitioner argues that the trial court should have instructed the jury on the definition of attempt "even without a request" and "on its own".   Petition at 40:19-20.

1  "attempt" is not commonly understood by those familiar with the English language.  The

2  word attempt connotes the intent to accomplish its subject and an act not prepatory in nature

3  -- both in law and in ordinary language.  See generally People v. Lyons, 235 Cal.App.3d

4  1456, 1461 (1991).  Accordingly, petitioner has not established that the trial court's failure

5  to define attempt was erroneous.

6  　　　　Moreover, petitioner has not established that any error in failing to define attempt "so

7  infected" the section 136.1 portion of his trial "that the resulting conviction violates due

8  process."  See Estelle v. McGuire, 502 U.S. 62, 72 (1991).  A habeas petitioner whose claim

9  involves a failure to give a particular instruction bears an "especially heavy burden."

10  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).  A review of the trial transcript,

11  including the closing arguments and jury instructions, reveals that petitioner cannot meet

12  this heavy burden.

13  　　　　 Accordingly, petitioner is not entitled to habeas relief on this claim.

14

15  　　　　10.　　　Sufficiency of Evidence Supporting Escape Conviction

16  　　　　Petitioner next claims that there was insufficient evidence to support his escape

17  conviction.  In particular, he alleges that the prosecution failed to establish that he was,

18  "arrested and booked" on a felony as required by California Penal Code § 4532.  The

19  elements of the crime of escape under Penal Code section 4532(b)(1) are:  (1) a person  has

20  been either arrested and booked for, or charged with, or convicted of, a felony; (2) that

21  person has been either confined in jail, or placed in the lawful custody of an officer; and (3)

22  that person escaped, or attempted escape from said jail or custody.  CALJIC 7.30; Cal.

23  Penal Code § 4532(b)(1).  At trial, the prosecution admitted into evidence a 'jail I.D. sheet'

24  to establish that petitioner was booked.  Petitioner argues, however,  that the prosecution

25  failed to lay an adequate foundation for the use of this sheet under the official record

26  exception to the hearsay rule, and that in the absence of this sheet, insufficient evidence

27  existed to establish the booking element.

28

1   Respondent contends that this portion of petitioner's insufficiency of evidence claim

2   is procedurally defaulted.  The appellate court ruled that petitioner's trial counsel's failure to

3   object to the adequacy of the foundation for the 'jail I.D. Sheet' waived this claim pursuant

4   to Evidence Code section 353.  As explained above, Evidence Code § 353 has been found

5   to be both independent and adequate for the purposes of federal habeas procedural default

6   analysis.  Melendez v. Plier, 288 F.3d 1120, 1125 (9th Cir. 2001); Bonin v. Calderon, 59

7   F.3d 815, 842-43 (9th Cir. 1995); see generally Coleman, 501 U.S. at 750 (claim is

8   procedurally defaulted from federal habeas review if state courts rejected it based on

9   independent and adequate state procedural rule).  Accordingly, petitioner's claim that the

10  prosecution laid an inadequate foundation for admissibility of the 'jail I.D. sheet' is

11  procedurally defaulted pursuant to an independent and adequate state procedural rule.

12  Accordingly, we do not reach the merits of this claim.[20]

13  Petitioner next argues that insufficient evidence established that he was "arrested".

14  The California appellate court addressed this claim as follows:

15  [Petitioner] claims that although there was evidence that he had been
    "booked," there was no evidence that he had been "'arrested' in relation to that
16  booking."  Harris relied on People v. Francisco, (1964) 228 Cal.App.2d 355,
    358, for the proposition that evidence of the "arrest" must appear in the record
17  and may not be inferred from the fact that [petitioner] was in custody.
    The I.D. sheet shows an arrest date of February 14, 1996, at 150 West
18  Hedding Street in San Jose at 2:05 p.m.  Four charges are listed, among them
    grand theft and dissuading a witness.  They are designated felonies on the
19  sheet.  Bail is set at $1 million.  Two warrant numbers are listed.  Additional
    evidence of an FBI Officer who interviewed Harris in the Beverly Hills jail in
20  an attempt to find [co-defendant] Miller revealed that [petitioner] was first
    arrested on the San Jose fraud case on warrants from Santa Clara County in
21  June.  Finally, the I.D. sheet shows that the Los Angeles Sheriff's Department
    was the transporting agency.
22  This is not the clearest evidence that Harris was arrested on the felony
    charges for which he was booked, and it takes some piecing together, but it is
23  sufficient to support conviction of the crime.  First, the evidence is credible
    and trustworthy.  It is based on the document generated in the ordinary course
24  when an inmate is booked into the jail and on the testimonial evidence of the
    FBI officer.  The testimony established that Harris was arrested in June in
25  Beverly Hills on Santa Clara County warrants alleging fraud and that he was
    placed in the Beverly Hills jail.  The Santa Clara County jail I.D. sheet shows
26

27  [20]Petitioner submits no evidence and makes no argument supporting his conclusory
    assertion that he is actually innocent of the escape conviction, and thus the "miscarriage of
28  justice" exception to procedural default, discussed above, does not apply.

that Harris was transported to Santa Clara by the Los Angeles Sheriff's Department and that the Santa Clara County jail on Hedding Street booked him in at 2:05 p.m. on February 14, 1996, on four charges including grand theft and dissuading a witness. Bail was set at $1 million. This evidence is sufficient to show that [petitioner] was "arrested."

Slip Op. at 34-35.

The appellate court's reasoning establishes persuasively that there was sufficient evidence that petitioner was "arrested in relation to the crimes for which he was booked." Further, the court has independently reviewed those portions of the record relating to petitioner's escape conviction and have found sufficient evidence supported the booking and arrest elements. In addition, the evidence admitted on the remaining two elements (that petitioner was confined in a county jail, and that he escaped from that jail) was overwhelming. Petitioner has failed to establish that the state appellate court's decision was contrary to clearly established United States Supreme Court precedent, or involved an unreasonable application of such precedent. 28 U.S.C. § 2254(d).

Accordingly, petitioner is not entitled to habeas relief on this claim.

11.    <u>Admission of Hearsay Evidence</u>

Petitioner also argues that the trial court's admission of hearsay statements by his escape co-conspirator Jamie Owen violated both his Sixth Amendment right to confront and cross-examine witnesses and his right to federal due process. Five hearsay statements by Owen were admitted at trial through the testimony of prosecution witnesses Dana Mulvani and Sergeant Brian Arrington. Petitioner's trial counsel objected to admission of the statements on hearsay grounds. The prosecution argued that the statements fell within the "declaration against interest" exception to the hearsay rule because Owen was subsequently charged with and convicted for petitioner's escape. After requiring the prosecution to show that the statements were made prior to petitioner's arrest (on the escape charge), the trial court overruled petitioner's trial counsel's objections and admitted the hearsay statements.

On direct appeal, petitioner challenged the admission of Owen's statements on three grounds.  Petitioner argued that the statements should not have been admitted under the "declaration against interest" exception because the prosecution did not establish that Owen was unavailable as a witness (the "unavailability argument"). He also argued that the statements did not qualify under that hearsay exception because they were not in fact against Owen's interest, and he argued that admission of the statements violated the Confrontation Clause.

Respondent argues here that petitioner's claim is procedurally defaulted because the state appellate court found that petitioner waived all his arguments challenging the admissibility of Owen's hearsay statements, and also rejected these arguments on the merits. When the state court denies a petition on the merits <u>and</u> as procedurally barred, the claims raised in that petition are procedurally barred if the cited procedural bar is an independent and adequate state ground for decision.  <u>See</u> <u>Bennett v. Mueller</u>, 322 F.3d 573, 580 (9th Cir. 2002).  By contrast, where a state court decision lacks a clear and express statement that the state court is relying on the procedural bar as a separate basis for the decision as to each claim, the district court may reach the merits of the claim.  <u>See</u> <u>Siripongs v. Calderon</u>, 35 F.3d 1308, 1316 (9th Cir. 1994).  The appellate court found that petitioner's failure to object at trial to the lack of proof that Owen was unavailable as a witness waived the issue on appeal pursuant to Evidence Code § 353.  Accordingly, petitioner has procedurally defaulted the unavailability argument portion of this claim.  <u>See</u> <u>Melendez</u>, 288 F.3d at 1125.  By contrast, it is not clear that the appellate court found that petitioner waived his two other arguments challenging the admission of the such statements, namely his argument that their admission violated due process because Owen's statements were not in fact against interest, and his argument that their admission violated the Confrontation Clause. Accordingly, petitioner has not procedurally defaulted these two alternative arguments, and the court will consider them on their merits.  <u>See</u> <u>Siripongs</u>, 35 F.3d at 1316.

The appellate court ruled that one of Owen's five statements was admissible under the hearsay exception for declarations against penological interest, while the other four

were admissible under different hearsay exceptions: three statements were admissible as

statements of a party declarant (Evidence Code § 1220), and one statement was admissible

as a statement of the declarant's then existing mental state offered to explain acts or conduct

of the declarant (Evidence Code § 1250(a)(2)).  Slip Op. at 40.  In the instant habeas

petition, however, petitioner merely repeats the argument made on direct appeal that the

admission of all five of the statements violate his rights of confrontation and due process

because they do not constitute declarations against interest.  Petitioner does not contest the

appellate court's finding that four of the statements were admissible under alternative

hearsay exceptions, nor does he argue that their admission under such exceptions violated

his due process or Sixth Amendment rights.  Accordingly, the court has no occasion to

decide whether the admission of the four hearsay statements found to be admissible

pursuant to hearsay exceptions other than the exception for declarations against interest

violated petitioner's right to due process or his right of confrontation under the Sixth

Amendment.

      The only statement by Owen that the state appellate court found to be a "declaration

against interest" was Owen's statement that "that Owen gave [petitioner] his booking

sheet."  Slip Op. at 40.  The appellate court reasoned that, "[the statement] establishes one

fact tending to show Owen's participation in the crime, that is, Owen's transfer to

[petitioner] of knowledge that enabled [petitioner] to unlawfully obtain his release from

jail."  Id.  The admission of this statement violated neither the Confrontation Clause nor

petitioner's right to due process.

      With respect to the Confrontation Clause, in Ohio v. Roberts, the United States

Supreme Court held that the veracity of hearsay statements is sufficiently dependable to

allow the untested admission of such statements against an accused when (1) "the evidence

falls within a firmly rooted hearsay exception" or (2) it contains "particularized guarantees

of trustworthiness" such that adversarial testing would be expected to add little, if anything,

to the statements' reliability.[21]  448 U.S. 56 (1980).  In Lilly v. Virginia, 527 U.S. 116

(1999), the Court was directly presented with the question of whether the declaration

against penal interest exception to the hearsay rule constitutes a firmly rooted hearsay

exception.  The Court[22] stated that, due to the broadness of the label, the category of

"'declaration[s] against penal interest' . . .defines too large a class for meaningful

Confrontation Clause analysis.'"  Id. at 127 (citations omitted).  The Court therefore divided

statements against interest into three subcategories: (1) voluntary admissions against the

declarant; (2) exculpatory evidence offered by a defendant who claims that the declarant

committed, or was involved in, the offense, and (3) evidence offered by the prosecution to

establish the guilt of an alleged accomplice of the declarant.  Id.

Owen's statement regarding his booking sheet falls into the third subcategory, i.e. a

confession of an accomplice implicating the defendant,  as did the statement at issue in

Lilly.  The Court concluded that such statements "are not within a firmly rooted hearsay

exception as that concept has been defined in our Confrontation Clause jurisprudence."  Id.

at 134.[23]  The Court reached this conclusion by reasoning that:

> when an alleged accomplice testifies, his confession that 'incriminate[s]
> himself together with defendant . . . ought to be received with suspicion, and

[21]Ohio v. Roberts was overruled by the United States Supreme Court in Crawford v. Washington, 124 S. Ct. 1354 (2004).  However, Crawford announced a "new rule" for purposes of Teague analysis, and that rule does not come within the exception to the Teague non-retroactivity rule for "watershed rules." Whorton v. Bockting, 127 S. Ct. 1173, 1184 (2007) (applying Teague v. Lane, 489 U.S. 288, 310-316 (1989)).  Crawford therefore does not apply retroactively on collateral attack.  Id.

[22]Although Lilly is a plurality decision, the Ninth Circuit has viewed the case as binding precedent and "clearly established federal law" for purposes of AEDPA.  See Forn v. Hornung, 343 F.3d 990, 995, n.4 (2003) (citing Hernandez v. Small, 282 F.3d 1132, 1140 (9th Cir. 2002).

[23]The state appellate court found no Confrontation Clause violation in the admission of this statement on the grounds that the "declaration against interest' exception is firmly rooted." Slip Op. at 37.  However, as Owen's statement falls within the third Lilly subcategory, the state appellate court's decision on this issue was "contrary to" clearly established federal law under 28 U.S.C. § 224(d)(1).  Lilly, 527 U.S. at 116; 28 U.S.C. § 2254(d).  However, for the reasons discussed below, the admission of Owen's statement does not violate the Confrontation Clause because contains "particularized guarantees of trustworthiness" such that the statement may be considered inherently reliable.  See Roberts, 448 U.S. at 66; Forn, 343 F.3d at 996.

1
2
with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses.
. . .

3
4
It is clear that our cases consistently have viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling outside the realm of those "hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability."

5
6
Id. at 131-133.  (citations omitted).  Although the Lilly opinion states that a "third

7
subcategory" statement is not admissible as a statement falling within a "firmly rooted

8
hearsay exception," it does not preclude such a statement from being admitted under

9
Roberts' "particularized guarantees of trustworthiness" standard.  Lilly, 527 U.S. at 134, n.5.

10
Therefore, admission of an accomplice's confession inculpating the defendant does not

11
violate the Confrontation Clause if (and only if) the statement bears particularized

12
guarantees of trustworthiness.

13
The appellate court described the circumstances under which Owen's statement was

14
made as follows:

15
16
In the instant case, Owen made two statements to Arrington.  The first was in the early morning hours of February 16,1996, after Harris was released and Owen wanted out, too.  Owen stated 'that he was asleep and had missed his call for to be released [sic] and had lost his wristband.'

17
18
19
20
21
Arrington spoke to Owen on a later occasion.  At that time Owen said 'he had made arrangements with Mr. Harris to switch identities because he would still be getting released . . .He just said that Mr. Harris had told him that they had no grounds to hold him any longer, that he would be released when they realized their mistake.'  Owen said Harris 'had promised him some money or amount' but Arrington testified that he could not remember the amount.  Arrington also stated that Owen said 'Mr. Harris had threatened [Owen's] family if he would go back on the deal that they had made . . .[Harris] had knowledge from [Owen's] booking sheet of where he lived.'

22
Slip Op. at 38.[24]

23
24
The appellate court's description of the facts reveals that Owen's statement about the booking sheet occurred during his second conversation with Sergeant Arrington-- the

25
26
27
28
_____

[24]Because a statement must possess 'sufficient indicia of trustworthiness' to fall within California's "declaration against interest" hearsay exception, the California appellate court evaluated the trustworthiness of Owen's statement when determining whether the statement fell within that exception.  This analysis may not be coextensive with the Confrontation Clause trustworthiness analysis in Roberts.  Moreover, for the reasons set forth below, the court finds that the statement was not trustworthy.

conversation during which Owen also told Arrington that petitioner had threatened to harm Owen's family if Owen did not follow through with their escape plan.  Owen's statements made during this conversation, in particular the statement that petitioner had threatened to harm his family, suggest that Owen was speaking with the intent of inculpating petitioner and the hope of receiving leniency for his own actions.  It is true that most of the statements made by Owen in this conversation with Arrington inculpated himself as well as petitioner in the escape.  But, "[o]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature."  Williamson v. United States, 512 U.S. 594, 599-600 (1994).  This can mean not only interspersing exculpatory statements with inculpatory ones, but also making statements that are both exculpatory and inculpatory at the same time.  Lilly was concerned with accomplice attempts at either "shifting or spreading"  Forn, 343 F.3d at 997 (citing Lilly, 527 U.S. at 133) (emphasis in original).

It is true that Dana Mulvani offered a nearly identical account of the Harris-Owen transaction in the jail dormitory.  The Lilly court, however, explicitly rejected the argument that the trustworthiness of a statement could be judged in relation to other corroborating evidence, finding it "irrelevant" that other evidence at trial corroborated the declaration at issue.  Lilly, 527 U.S. at 137-38.  This principle was first announced in Idaho v. Wright, 497 U.S. 805, 822 (1990), when the Court, interpreting the Confrontation Clause, held that "hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial."  As a result, the corroboration provided by Mulvani's statement is irrelevant to the trustworthiness of Owen's statement for purposes of the Confrontation Clause analysis.

Because Owen's statement about the booking sheet was made to the authorities during the same conversation as other statements whose purpose was transparently to "shift or spread" blame, and because Mulvani's corroborating testimony is irrelevant under Lilly, we find that the statement did not bear "particularized guarantees of trustworthiness" under Roberts.  Thus, as the 'booking sheet' statement neither falls within a firmly rooted hearsay

1    exception nor contains particularized guarantees of trustworthiness, its admission, without

2    an opportunity to cross-examine Owen, violated petitioner's rights under the Confrontation

3    Clause.

4            This does not end our analysis, however.  In order to determine whether petitioner is

5    entitled to habeas relief as a result of the Confrontation Clause violation, the court must

6    conduct a harmless error analysis.  See Delaware v. Van Arsdall, 475 U.S. 673, 681-84

7    (1986).  Under Brecht v. Abrahamson, habeas relief is proper only if any error by the state

8    courts properly subject to harmless error analysis "had substantial and injurious effect or

9    influence in determining the jury's verdict."  507 U.S. 619, 637 (1993).  The evidence

10   offered against petitioner at trial on the escape charge was overwhelming, independent of

11   the booking sheet statement - indeed, even independent of all five of the disputed Owen's

12   statements.  Dana Mulvani testified from his personal knowledge to a complete description

13   of petitioner's escape plan, as the plan was hatched in Mulvani's presence and even at his

14   (allegedly joking) suggestion.  RT at 1382:3-27.  He personally witnessed Owen hand his

15   identity wristband to petitioner. Rt at 385:4-15.  Moreover, petitioner's fingerprints were

16   identified as those on Owen's release documentation.  RT at 1521:10 - 1523:3; Trial Exhibit

17   No. 47, lodged July 28, 2003, as "Identification Report."  Petitioner offered no legitimate

18   explanation for these fingerprints, nor was any such explanation remotely apparent from the

19   prosecution's case in chief.  Finally, as pointed out by respondent, "[p]etitioner was missing

20   from the jail the next morning and Owen was still there."  Answer at 50:15-16.  Under such

21   circumstances, petitioner would have likely been convicted absent the admission of Owen's

22   statements, and thus any violation of petitioner's Confrontation Clause stemming therefrom

23   did not have a "substantial and injurious effect or influence in determining the jury's

24   verdict."  Brecht, 507 U.S. at 637.  Therefore, petitioner is not entitled to habeas relief on

25   his Sixth Amendment claim.

26          As discussed above, petitioner also contends that admission of the "booking sheet

27   statement" violated his right to due process because the statement did not fall within any

28   exception to the hearsay rule, including California's declaration against interest exception.

Even if this were the case, and a due process violation occurred, in order to obtain habeas relief on the of such an evidentiary error, petitioner must show prejudice under <u>Brecht</u>. <u>Dillard v. Roe</u>, 244 F.3d 758, 767, n.7 (9th Cir. 2001) (<u>quoting</u> <u>Brecht</u>, 507 U.S. at 623). As explained above, petitioner has not established that admission of Owen's statement about the booking sheet had a substantial and injurious effect or influence in determining the jury's verdict.  Therefore, petitioner cannot establish that he is entitled to habeas relief on his due process claim.

           12.    <u>Sentencing Claim</u>

Petitioner contends that his sentence violates his right to due process because the trial court did not prove beyond a reasonable doubt that his prior convictions qualified as "strikes" under California's "three strikes" law.  Amend Pet. at 3-4.  Specifically, petitioner argues that his two prior convictions, in 1993 and 1995, did not qualify as strikes because he was only sentenced to probation and not to a term in prison.  <u>Id.</u> at 3-4, Brief attached to Petition at 4-6.

The federal right to due process does require, however, that every element of a sentence enhancement be proven beyond a reasonable doubt.  <u>See</u> <u>Garcia v. Carey</u>, 395 F.3d 1099, 1102 (9th Cir. 2005).  Here, the record reflects ample evidence that petitioner has four prior serious felony strike convictions under California law.  Based on certified records of petitioner's prior convictions and the testimony of a fingerprint expert, the trial court found that petitioner had suffered the following four prior convictions:1993 convictions for attempted robbery (Cal. Penal Code §§ 211, 664) and two counts of felony assault with personal use of a deadly weapon (Cal. Penal Code §§ 245(a)(!), 1192.7(c)(23)), and a 1995 conviction for robbery (Cal. Penal Codes § 211).  RT at 2583-91; CT at 1032-1044-45.  The trial court found that all four of these convictions qualified as strikes under California's three strikes law (Cal. Penal Code §§ 667(b)-(i) and 1170.12)).  RT at 2593-94; CT 1109. Furthermore, at petitioner's entry of plea in 1993, he admitted that the attempted robbery and two counts of assault with a deadly weapon constituted "serious" felony convictions under California Penal Code § 1192.7(c), which necessarily qualifies them as strikes.  CT at

1032, 1044-45;  see Cal. Pen. Code §§ 1192.7(c), 667, 1170.12.[25]  When petitioner later

pled guilty to robbery in 1995, he again admitted that the foregoing previous convictions

(from 1993) constituted "strike" convictions.  CT at 1093-95, 1097-99.

        The fact that petitioner received probation did not preclude them from qualifying as

strikes under California law.  To begin with, respondent argues, correctly, that the question

of whether petitioner's prior convictions qualify as "strikes" under California's three strikes

law is a question of state law.  This court is bound by the California Supreme Court's

rejection of petitioner's claim to the extent it amounts to a ruling that petitioner's prior

convictions qualify as strikes as a matter of state law.  See Bradshaw v. Richey, 546 U.S.

74, 76 (2005).  In any event, petitioner's prior convictions did in fact qualify as strikes

under California law.  Petitioner indicates, correctly, that assault with a deadly weapon is a

"wobbler" offense, i.e. it can be either a felony or a misdemeanor, and that it is considered

to be a misdemeanor if the defendant receives "summary probation" at the time of

sentencing.  See Cal. Pen. Code § 17(b).  In this case, however, petitioner was placed on

felony probation, not summary probation, on his two assault with a deadly weapon

convictions.  CT. at 1033.  As a result, the convictions were felonies, not misdemeanors,

that qualified as serious "strike" felonies under California law.  See People v. Balderas, 41

Cal.3d 144, 203 (1985); Cal. Pen. Code § 1192.7(c)(23).  Furthermore, petitioner's two

other prior convictions, for robbery and attempted robbery, are not "wobblers," but are

strictly felony convictions.  See Cal. Pen. Code § 213.  Petitioner cites no authority, nor is

this court aware of any, providing that petitioner's receiving probation for his robbery and

attempted robbery convictions preclude them from qualifying as strikes.

        In sum, there was sufficient evidence upon which the trial could find beyond a

reasonable doubt that petitioner's prior convictions qualified as "strikes" under California

law.  Accordingly, petitioner is not entitled to habeas relief on this claim.

_____

        [25]Petitioner claims that he plead to his prior convictions as "nonserious felonies during
a plea bargain."  Brief attached to Amend. Pet. at 7-10.  He does not provide any evidence in
support of this allegation, which in any event is contradicted by the record of petitioner's
plea hearings, as cited above, at which he admitted they qualified as strikes.

1

**CONCLUSION**

2      In light of the foregoing, the petition for a writ of habeas corpus is DENIED as to

3 petitioner's convictions for theft by false pretenses of Nicholas Brayevich, attempting to

4 dissuade Nicholas Brayevich from testifying, and credit card forgery with respect to Wilbur

5 Johnson, and escape from a county jail.  Rule 11(a) of the Rules Governing Section 2254

6 Cases now requires a district court to rule on whether a petitioner is entitled to a certificate

7 of appealability in the same order in which the petition is denied.  Petitioner has failed to

8 make a substantial showing that his claims amounted to a denial of his constitutional rights

9 or demonstrate that a reasonable jurist would find the denial of his claim debatable or

10 wrong.  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Consequently, no certificate of

11 appealability is warranted in this case.

12      The petition for a writ of habeas corpus is GRANTED as to petitioner's conviction

13 for grand theft from Wilbur Johnson; the conviction and the portion of petitioner's sentence

14 based thereon are VACATED.  Within 60 days of the date this order is filed, the respondent

15 shall seek a recalculated sentence from the state superior court, or shall appeal this matter to

16 the United States Court of Appeals for the Ninth Circuit.[26]  Petitioner's continued custody is

17 lawful under his remaining convictions.

18      The clerk shall enter judgment and close the file.

19      IT IS SO ORDERED.

20

21 DATED: _____        _____
                                     RONALD M. WHYTE
22                                   United States District Judge

23

_____

24      [26]The court notes Petitioner cannot be retried for this conviction.  In Burks v. United

25 States, 437 U.S. 1 (1978), the United States Supreme Court held that double jeopardy bars
   retrial when a conviction is reversed because the evidence presented at the first trial was

26 legally insufficient.  This is because the government has had a fair opportunity but failed to
   develop a case that warranted submission to a jury.  See Burks, 437 U.S. at 11; see, e.g, Jones

27 v. Wood, 207 F.3d 557, 563-64 (9th Cir. 2000) (in habeas case, addressing sufficiency of

28 evidence to determine whether retrial after granting writ was permissible).